**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Ancesar CAMARGO,
Defendant–Appellant.**

**No. 89–3424.**

United States Court of Appeals,
Seventh Circuit.

Argued May 29, 1990.

Decided July 23, 1990.

---

180

William J. Cook, Asst. U.S. Atty., Ava M. Gould, Barry R. Elden, Asst. U.S. Atty., Office of U.S. Atty., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee, U.S.

John A. Meyer, Chicago, Ill., for defendant-appellant, Ancesar Camargo.

Ancesar Camargo, pro se.

Before BAUER, Chief Judge, FLAUM, Circuit Judge, and ESCHBACH, Senior Circuit Judge.

BAUER, Chief Judge.

A jury convicted Ancesar Camargo of one count of conspiracy to possess and distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, one count of possession with intent to distribute and one count of distributing cocaine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Camargo raises on appeal several challenges to both his conviction and his sentence, all of which are without merit. We therefore affirm.

I.

Henry Olave was an illegal immigrant from Cali, Colombia who worked in a body shop on the near northwest side of Chicago installing "stash" boxes used to conceal narcotics in cars. Olave also ran drugs from Florida to Chicago and was arrested in 1986 during one of these runs. While serving his seven year sentence, Olave was approached by Detective Berti of the Chicago Police, the officer who had arrested him in 1986, and asked to work as a confidential informant. Olave thereafter was granted work release by the Illinois Parole Board and returned to work in the body shop.

In 1988, Olave went to work for Freddie Correa at Wicker Park Auto Repair. Here Olave met Ancesar Camargo, Correa's brother, and Guillermo Reyes, one of Correa's employees.

On January 11, 1989, Reyes approached Olave and told him that he was expecting a shipment of cocaine and wondered whether he had any customers. Later that day Olave told Camargo that he might have some customers. Camargo said that he would appreciate the help because he had lost money on an earlier drug transaction. Olave called his contact at the Drug Enforcement Agency ("the DEA") and was instructed to purchase cocaine.

The next day Olave contacted Camargo by beeper. When Camargo called Olave back, Olave told him that he wanted 3 kilograms of cocaine. This conversation was recorded and the transcript later provided to the jury. A price of $15,000 per kilogram was set and Olave told Camargo that he would pay for the drugs the following week. Camargo then told Olave that he would contact Reyes and tell him to expect Olave's call.

On January 13, Olave called Reyes and they arranged to meet at the Venture department store on Peterson Avenue. This conversation also was recorded. Prior to the meeting, Olave met with Detective Berti and was equipped with a body recorder. At this point DEA agent Sabrina Carlson joined Olave to pose as his sister-in-law "Martha."

Olave and Carlson drove to the Venture in Carlson's car. When Reyes failed to appear, Olave called Camargo on Carlson's mobile phone and asked "what was going on with William [Reyes], how come he was taking too long?" Camargo told him to look for Reyes inside. Thereafter, Olave spotted Reyes outside the store.

Olave, Reyes and Carlson then drove to a hot dog stand and had lunch. Reyes left to call Camargo and returned saying that everything was fine. Reyes warned them, however, they were having problems selling the cocaine because it was yellowish. Olave was not deterred, informing Reyes that Camargo had approved a consignment sale of this cocaine.

The three of them drove to an almost empty apartment at 5713 N. Magnolia Street. Reyes retrieved a large duffel bag from the front closet. From the nine kilogram-sized bricks of cocaine inside the duffel, Carlson selected three.[1] Olave said that he would pay next Tuesday or Wednesday and would call when arrangements were final. Reyes agreed with the arrangement as long as it was okay with Camargo. Olave and Carlson dropped Reyes back at the Venture.

Six days later, on January 19, Olave called Reyes and told him that the $45,000 payment would be delayed because he had to clean the cocaine before he could sell it. This conversation was recorded. Two days later, Olave called Reyes to tell him payment would be forthcoming. Reyes said that Camargo wanted to talk to him. When Olave called Camargo, Camargo told him that he better resolve his payment problems. These conversations also were recorded.

On January 25, Olave called Camargo to say that he had the money and asked him to accompany Reyes when Reyes collected payment. He also said that when they arrived at the appointed destination, he wanted Camargo to get in the car with "Martha" (Agent Carlson).

Camargo and Reyes were arrested and later indicted for conspiracy to possess and distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846, and for possession and distribution of cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Prior to trial, Reyes pleaded guilty to all charges. Camargo went to trial before a jury which convicted him on all charges. The district court entered judgment on the verdict and sentenced Camargo to 168 months imprisonment on each count, to run concurrently, followed by five years supervised release. Camargo filed a timely notice of appeal.

## II.

Camargo raises a number of issues of appeal, several of which concern the tape-recorded evidence. Camargo contends that the district court committed reversible error by admitting into evidence written, translated transcripts of the tape-recorded conversations between Olave and Reyes, and Olave and Camargo; by permitting the transcripts to be used during jury deliberations; and by improperly instructing the jury about the use of the transcripts. We disagree.

---

**1.** The next day, DEA agents confiscated the remaining 6 kilograms of cocaine from the Mag-

nolia Street apartment.

■ The decision to permit the use of written transcripts of tape-recorded conversations is committed to the sound discretion of the district court. *United States v. Keck*, 773 F.2d 759, 766 (7th Cir.1985). In this case, the transcripts were a virtual necessity because the recorded conversations took place in Spanish. Defense counsel did not and does not contend that the transcripts were inaccurate, nor did defense counsel proffer an alternative translation of the conversations at trial. *Compare United States v. Briscoe*, 896 F.2d 1476 (7th Cir.1990); *United States v. Zambrana*, 841 F.2d 1320 (7th Cir.1988). Indeed, counsel did not even object at trial to the admission of the transcripts into evidence, and so has waived any argument before this court as to their admission. *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988).

■ Counsel did object to the court's decision to permit the transcripts to accompany the jury into the deliberation room. This court repeatedly has approved the practice of sending transcripts to the jury room. *See, e.g., United States v. Doerr*, 886 F.2d 944, 966 (7th Cir.1989); *United States v. Puerta Restrepo*, 814 F.2d 1236, 1242 (7th Cir.1987); *United States v. Dorn*, 561 F.2d 1252, 1257 (7th Cir.1977), *overruled on other grounds, United States v. Read*, 658 F.2d 1225, 1236 (7th Cir.1981). *See also United States v. Brown*, 872 F.2d 385, 392 (11th Cir.), *cert. denied*, — U.S. ——, 110 S.Ct. 253, 107 L.Ed.2d 203 (1989) (absent a showing that the transcripts are inaccurate or that specific prejudice occurred, no error in allowing jury to have transcripts during deliberations).

Camargo acknowledges that this practice is commonplace, but contends that special jury instructions are needed in such circumstances. In this case, the court instructed the jury that the taped conversations constituted the real evidence, and that the transcripts were the translator's interpretation of the conversations which took place in Spanish. In other situations in which the transcripts have been sent back to the jury room, the court has added the instruction that should there be any discrepancy between the tapes and the transcripts, the tapes control. *Doerr*, 886 F.2d at 966; *Puerta Restrepo*, 814 F.2d at 1241; *Dorn*, 561 F.2d at 1257. Such an instruction would have been a throwaway here; the tapes were in Spanish whereas the jury was English-speaking, and further, Camargo never argued that the transcripts were inaccurate. We therefore conclude that the court committed no error in its handling of these transcripts.

Second, Camargo contends that the district court committed error by refusing to admit a transcript proffered by the defense. Camargo sought to admit the transcript of the recording of the October 12 meeting between Olave, Carlson and Reyes. The district court refused to admit this transcript, finding that most of the tape was unintelligible (Olave's body recorder had malfunctioned) and would confuse the jury.

■ Generally, tape recordings which are only partially unintelligible are admissible unless the recording as a whole is rendered untrustworthy by the unintelligible portions. *See Zambrana*, 841 F.2d at 1337, and the cases cited therein. The determination of untrustworthiness, like the ultimate determination of admissibility, is left to the sound discretion of the district court. *Id.* In this case, the court found that most of the tape was unintelligible and would confuse the jury. Camargo does not offer any argument to refute either of the court's findings. Accordingly, we find that the district court did not abuse its discretion.

■ Third, Camargo claims that the court failed to respond properly to a jury question. After the jurors had deliberated a couple of hours, they sent Judge Holderman the following note:

> Your Honor: Regard to Count I, number 4 regards Guillermo Reyes. Should our decision include number 4 or not?

Count 1, paragraph 4 of the indictment stated:

> 4. It was further part of the conspiracy that the defendant Guillermo Reyes would deliver quantities of cocaine on

consignment to individuals on behalf of the defendant Camargo.

The court orally instructed the jury that they should read all of the instructions again and consider them as a whole in making a determination as to the defendant on trial.

Camargo wanted the court to reread the instructions, particularly the conspiracy instruction, to the jury. There being no indication that the jurors were illiterate (and no doubt that at least one juror was literate—the one who sent out the note), the court's instruction accomplished the same purpose. We find no abuse of discretion. *See United States v. Cherek*, 734 F.2d 1248 (7th Cir.1984).

Fourth, Camargo contends that the evidence was insufficient to support his conviction for constructive possession of the six kilograms of cocaine which were recovered from the apartment rented by Reyes. We will uphold a conviction challenged for insufficient evidence as long as *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). In making this determination we view the evidence, including the reasonable inferences which can be drawn from the evidence, in the light most favorable to the government. *Id. See also United States v. Douglas*, 874 F.2d 1145, 1151 (7th Cir.), *cert. denied*, — U.S. —, 110 S.Ct. 126, 107 L.Ed.2d 87 (1989).

■ "To prove constructive possession in narcotics cases, the government must show that the defendant had the ability to exercise control over the narcotics, that is, the power to possess them." *United States v. Molinaro*, 877 F.2d 1341, 1348 (7th Cir.1989) (citing *United States v. Rodriguez*, 831 F.2d 162, 167 (7th Cir.1987)). Although mere association with those who possess narcotics is not enough to convict based on constructive possession, the ability to assure delivery, in combination with association with actual possessors, is. *United States v. Manzella*, 791 F.2d 1263, 1266–67 (7th Cir.1986). Evidence that the defendant was one of a group of conspirators who jointly controlled the narcotics also will sustain a conviction. *Molinaro*, 877 F.2d at 1348; *Manzella*, 791 F.2d at 1266.[2]

■ Camargo does not challenge the sufficiency of the evidence which supported his conviction for conspiracy to possess and distribute cocaine and for distributing cocaine. The cocaine which was the subject of those two counts came from the *same* duffel bag in the *same* closet in the *same* apartment as the cocaine which was the subject of the possession count. A reasonable jury certainly could infer that if Camargo had the ability to assure distribution of three of those nine kilograms of cocaine in the duffel bag, then he also had constructive possession of the remaining six kilograms. This inference is heightened by the fact that Carlson was allowed to select from all nine bricks the three she wanted. We therefore reject Camargo's challenge to the sufficiency of the evidence.

■ Last, Camargo raises two issues with respect to his sentencing. First, he

**2.** The government contends that the doctrine of *Pinkerton v. United States*, 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), whereby one conspirator can be held liable for the crimes of another if committed in furtherance of the conspiracy, is applicable here. The jury must be instructed in this theory of guilt. *United States v. Wozniak*, 781 F.2d 95, 97 (7th Cir.1985). In this case, the judge gave the following instruction:

A conspirator is responsible for offenses committed by his or her fellow conspirators if he or she was a member of the conspiracy when the offense was committed, and if the offense was committed in furtherance of or as a natural consequence of the conspiracy.

This, however, is only half of the instruction. The other half continues:

Therefore, if you find a defendant guilty of the conspiracy charged in Count(s) __ and if you find beyond a reasonable doubt that while he was a member of the conspiracy, his fellow conspirator(s) committed the offense(s) in Count(s) __ in furtherance of or as a natural consequence of that conspiracy, then you should find him guilty of Count(s) __.

Federal Criminal Jury Instructions of the Seventh Circuit, Vol. III, p. 6 (1986).

takes issue with the district court's decision to increase his base offense level by two levels for his role as a leader and organizer, see Guidelines § 3B1.1(c). Second, he challenges the court's refusal to grant a two-level reduction for his acceptance of responsibility, see Guidelines § 3E1.1(a). As long as the district court correctly applied the Federal Sentencing Guidelines to findings of fact which are not clearly erroneous, Camargo's sentence will be upheld on appeal. *United States v. Vopravil*, 891 F.2d 155, 157 (7th Cir.1989).

 Whether Camargo was "an organizer, leader, manager, or supervisor in any criminal activity other than described in [3B1.1](a) or [3B1.1](b)," Guidelines § 3B1.1(c), thus warranting a two-level increase in his base offense level, is a question of fact for the district court to resolve. *United States v. Herrera*, 878 F.2d 997, 1000 (7th Cir.1989). Although the district court did not make subsidiary findings of fact,[3] the court did make the ultimate finding, citing the evidence adduced at trial,[4] that Camargo was the leader of this criminal organization.

 The evidence at trial showed that Camargo remained in the background while Reyes took care of the more routine details of the drug transaction. This juxtaposition of roles could support the government's claim that Camargo was the leader or, alternatively, Camargo's claim that Reyes was the leader. The other evidence, however, showed that Reyes was unwilling to act independently of Camargo. For instance, prior to taking Olave and Carlson to the "stash" apartment, Reyes had to call Camargo. When Olave told Reyes that he would pay for the cocaine the following week, Reyes replied only if it was okay with Camargo. After Olave had delayed making payment, Reyes told him he better call Camargo and that Camargo wanted to talk to him. It was Camargo who then demanded payment. This evidence is sufficient to support the district court's conclusion that Camargo was the leader and organizer of the criminal transaction.

 Camargo also claims that the court should have granted the two level reduction in his base offense level because he "clearly demonstrate[d] a recognition and affirmative acceptance of personal responsibility for his criminal conduct...." Guidelines § 3E1.1(a). Camargo bears the burden of proving his entitlement to this reduction. *United States v. Howard*, 894 F.2d 1085, 1091 (9th Cir.1990). Furthermore, "the sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility," and thus the judge's determination "is entitled to great deference on review and should not be disturbed unless it is without foundation." *United States v. Wivell*, 893 F.2d 156, 159 (8th Cir.1990). The district court apparently believed Camargo's apology was a calculated simulation of remorse and therefore refused to grant the reduction. Camargo has given us no reason to believe that this assessment by the district court was without foundation. Accordingly, we refuse to disturb it.

### III.

For the foregoing reasons, all aspects of Camargo's conviction and sentence are

AFFIRMED.

---

3. In *Herrera*, 878 F.2d at 1002, we suggested that the district courts clarify their ultimate findings of fact with subsidiary findings of fact when possible. "'Specific findings will both guide reviewing courts to the evidentiary basis for sentencing judgments and also help the trial judge to identify matters relevant to application of the guidelines.'" *Id.* (quoting *United States v. Mejia–Orosco*, 867 F.2d 216, 221–22 (5th Cir. 1989)). *See also United States v. Agyemang*, 876 F.2d 1264, 1274–75 (7th Cir.1989) (Cudahy, J. concurring). We reiterate that suggestion here.

4. Camargo claims that the district court improperly considered speculative information contained in the presentence investigation (PSI) report. The PSI report did characterize Camargo as the leader based upon information provided by one of the DEA case agents. The district court, however, specifically stated, in accordance with Fed.R.Crim.P. 32(c)(3)(D), that it was relying only upon the evidence at trial in finding that Camargo was the leader. *See United States v. Stout*, 882 F.2d 270, 271–72 (7th Cir. 1989).