**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Victor ELIZONDO, Juan Carlos Colin, Valdemar Colin, Alejandro Rodriguez and Fernando Rodriguez, Defendants–Appellants.**

Nos. 89–2551, 89–2632, 89–2633, 89–2756 and 89–2888.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 11, 1990.

Decided Nov. 2, 1990.

Modified Dec. 19, 1990.

James L. Santelle, Matthew L. Jacobs, Stephen A. Ingraham, Asst. U.S. Attys., Milwaukee, Wis., for plaintiff-appellee.

Gerald M. Schwartz, Milwaukee, Wis., Richard P. Mesa, El Paso, Tex., for Victor Elizondo.

Bernard J. Panetta, II, Mary Stillinger, El Paso, Tex., for Juan C. Colin.

Stephen M. Glynn, Shellow, Shellow & Glynn, Milwaukee, Wis., Richard P. Mesa, El Paso, Tex., for Valdemar Colin.

Thomas G. Halloran, Milwaukee, Wis., for Alejandro Rodriguez.

Michael A. Clarke, Milwaukee, Wis., for Fernando Rodriguez.

Fernando Rodriguez, Milwaukee, Wis., pro se.

Before WOOD, Jr., POSNER, and FLAUM, Circuit Judges.

FLAUM, Circuit Judge.

Victor Elizondo, Juan Carlos Colin, Valdemar Colin, Alejandro Rodriguez, and Fernando Rodriguez were charged with conspiracy to distribute marijuana and possession with intent to distribute marijuana. After a jury trial, all defendants were convicted of conspiracy. All defendants except Alejandro Rodriguez were also convicted under one or more counts of posses-

sion with intent to distribute. Defendants jointly challenge these convictions on several grounds. First, they allege that improper prosecution questions prejudiced their right to a fair trial. Second, they allege that the trial judge's *Pinkerton* instruction was insufficient. Third, they allege that the trial judge erred in allowing the jury to consider evidence elicited by the prosecution in support of a dismissed count as to other counts. In addition, defendant Juan Carlos Colin challenges the sufficiency of the evidence supporting his convictions for conspiracy and possession with intent to distribute. Though we disapprove of certain prosecution conduct at trial and find one of the jury instructions to have been inadequate, we find the errors committed to be harmless and affirm all the convictions.

## I. FACTUAL BACKGROUND

In May 1984, Arturo Garay was released on parole from a federal prison where he was serving a sentence for heroin possession. He moved to Milwaukee, where later that year he received a surprise visit from a former associate, defendant Valdemar Colin ("Valdemar"). Valdemar did not come empty handed: he gave Arturo Garay ("Arturo") approximately 120 pounds of marijuana to dispose of, in the hopes that the gift would improve Arturo's finances.

Valdemar's gift to Arturo was the first of five shipments of marijuana Valdemar, sometimes accompanied by his son Juan Carlos, brought north from Mexico. Valdemar's associates stored and distributed the marijuana in the Milwaukee area. These associates divide into two groups: first, Valdemar's co-defendants, and second, five unindicted coconspirators who testified for the government at trial: Arturo Garay, Alma Garay, Tom Koss, and Dennis and Diane Morgan.

A grand jury charged Valdemar Colin and his four co-defendants in a six count indictment:[1] Count 1 alleged that all defendants had engaged in a conspiracy to possess with intent to distribute marijuana in violation of 18 U.S.C. § 2, 21 U.S.C. § 841(a)(1), and 21 U.S.C. § 846; counts 2 through 6 alleged that individual defendants possessed marijuana with the intent to distribute, in violation of 21 U.S.C. § 841(a)(1).

Each of the five substantive counts related to a specific shipment of marijuana transported by Valdemar to the Midwest and distributed in the Milwaukee area. Count 2 concerned the initial "gift" of marijuana made by Valdemar to Arturo. Arturo, in need of a place to store the 120 pounds of marijuana given him by Valdemar, contacted his brother-in-law, defendant Alejandro Rodriguez ("Alejandro"). Alejandro introduced Arturo to Tom Koss, who agreed to allow Arturo to store the marijuana in Koss's Milwaukee-area home.

Count 3 concerned Valdemar's next trip north, in March, 1985.[2] On his way north, Valdemar telephoned Arturo and arranged a meeting in Joliet, Illinois. Arturo, accompanied by Alejandro Rodriguez's brother, defendant Fernando Rodriguez ("Fernando"), met Valdemar in Joliet and obtained the keys to a truck containing 300–400 pounds of marijuana. Arturo drove the truck back to Tom Koss's house, with Fernando, driving in another car, providing an escort. A few days later, Koss, acting on instructions from Alejandro, rented a truck, loaded it with the marijuana that had been stored in his garage, and left it in the parking lot of a Milwaukee shopping mall. Koss then surrendered the keys to this truck to Alejandro, who gave them to an unknown party who drove away in the truck after buying its illicit cargo.

The events surrounding Count 4 took place in April, 1985. Again, Valdemar arrived in the Midwest with a load of marijua-

---

**1.** The indictment handed down by the grand jury contained eight counts. With the consent of all parties, two counts were dismissed before the trial began. The remaining counts of the original indictment were renumbered as counts one through six.

**2.** As discussed below, the acts forming the basis for Count three were initially alleged by the government to have occurred earlier, in October, 1984. This variance in dates led the trial judge to dismiss the Count.

na. He again tried to contact Arturo, and reached him through an intermediary, Alejandro. After relaying Valdemar's message to Arturo, Alejandro informed Tom Koss that his storage services would again be needed. Arturo, accompanied by his wife Alma, met Valdemar in a Bloomington, Illinois motel. Valdemar's son, defendant Juan Carlos Colin ("Juan Carlos") was also at the motel at the time Arturo and Valdemar met. On Arturo's instructions, Fernando and defendant Victor Elizondo ("Elizondo") also arrived in Bloomington. As in the facts supporting Count 3, Valdemar again transferred the marijuana by giving Arturo the keys to a vehicle loaded with the contraband crop. However, this time Elizondo rather than Arturo drove the load back to Milwaukee. He was escorted on this trip by Arturo and Fernando.

Count 5 concerned Valdemar's next trip north, in the late Spring of 1985. As he had done previously, Valdemar drove north from Mexico and made contact with Arturo upon reaching the Midwest. This time the meeting between Valdemar, accompanied by Juan Carlos, and Arturo, accompanied by Elizondo, took place in a motel in western Ohio. Juan Carlos and Elizondo departed for a storage facility where the marijuana was located, returning two hours later. Elizondo later told Arturo that during the two hours approximately 150 pounds of marijuana had been loaded into his car. Elizondo drove the car back to Milwaukee, escorted by Arturo.

Valdemar made no further shipments for approximately 18 months. During this period, Arturo separated from his wife Alma Garay and relocated to El Paso, Texas, in violation of the terms of his parole. Arturo was tried for that parole violation and in October, 1986 began serving a one-year prison term. Alma traveled to El Paso to see Arturo in October, 1986, and, while there, met Valdemar's wife Herlinda. Herlinda informed Alma that she and her son Juan Carlos would need Alma's help in trafficking marijuana.

A few months later, in December, 1986, Alma received a phone call from Valdemar instructing her to meet him at a motel in Bloomington, Illinois. The shipment that Valdemar brought to Bloomington at the time of this meeting forms the basis for Count 6 of the government's indictment. At the meeting, Valdemar asked to be introduced to Tom Koss. Alma and Valdemar drove north to Wisconsin to meet Koss and ascertain whether Koss would again allow his property to be used to store marijuana. Koss told Valdemar that his property was not suitable for storing the quantity of marijuana Valdemar had brought north, but that Valdemar might wish to use the farm of his sister and brother-in-law, Diane and Dennis Morgan. Valdemar, Alma, and Koss then met the Morgans. Having secured what he considered to be the Morgans' agreement to use their farm to store his marijuana, Valdemar departed, and arrived at the Morgans' farm early the following morning with a truck containing approximately 1,000 pounds of marijuana. Valdemar and Dennis Morgan unloaded this marijuana into the Morgans' granary.

For the next several days, through New Year's Eve 1986, Valdemar stayed at the Morgans' farm, where he was visited by Alma, Juan Carlos, and Tom Koss. During these visits, Tom Koss and Valdemar weighed and repackaged the marijuana into smaller amounts in preparation for sale. Alma served as translator during these meetings.

Late on New Year's Eve, 1986, Valdemar told the Morgans that he had just purchased a house in Milwaukee. A Milwaukee realtor testified that earlier that evening he had met Valdemar in connection with the purchase of residential property. Shortly after New Year's Day, 1987, Valdemar stopped spending nights at the Morgans' farm. However, he returned to the farm on occasion to unlock the granary where he stored the marijuana and provide marijuana to Tom Koss, who was distributing it to area buyers. In return, Koss made a number of payments to Valdemar in the presence of Alma and Juan Carlos, and one payment to Juan Carlos. Alma also paid Juan Carlos for marijuana she was distributing.

On February 2, 1987, Tom Koss was arrested after a search of his house revealed a small amount of marijuana and a large amount of cash. Koss's cooperation led police to Alma, who was arrested on February 6, 1987 while in possession of 30 pounds of marijuana. On the same day, police searching the granary at the Morgans' farm discovered over 500 pounds of marijuana. Tom Koss, Alma Garay, and the Morgans were granted immunity from prosecution in return for their testimony at trial. Arturo, then serving time for his parole violation, also agreed to cooperate with the government in exchange for immunity.

After a nine day trial, a jury convicted all defendants of conspiracy to distribute marijuana under Count 1 of the indictment. In addition, each individual defendant except Alejandro Rodriguez was convicted of one or more of the individual possession counts, as follows:

Valdemar Colin: guilty on Counts 2, 4, 5, and 6;

Juan Carlos Colin: guilty on Count 5;

Fernando Rodriguez: guilty on Count 4;

Victor Elizondo: guilty on Counts 4 and 5.

As discussed more fully below, Count 3 was dismissed at the close of the government's case. The jury acquitted Juan Carlos Colin and Alejandro Rodriguez on Count 4, and Fernando Rodriguez on Count 6.

## II. IMPROPER QUESTIONING

■ Defendants' first allegation of error relates to prejudicial prosecution cross-examination of defendant Valdemar Colin. At trial, Valdemar sought to introduce an accident report prepared by Mexican authorities attesting to his involvement in a car crash in Mexico on December 29, 1986. This report was inconsistent with the testimony of government witnesses who placed Valdemar at the Morgans' farm after unloading his last shipment of marijuana into their granary. Valdemar also supported his alibi with the testimony of a friend who testified that he saw Valdemar at a social occasion in Mexico on December 27, 1986.

When Valdemar sought to introduce the Mexican accident report during the course of his direct examination, the district court excluded the report as hearsay. Apparently not content with exclusion of the accident report, during Valdemar's cross-examination the Assistant United States Attorney asked him a series of questions concerning how he had obtained the Mexican accident report.[3] Shortly after the prosecution completed this line of questioning, Valdemar left the stand.

Following a recess, Valdemar moved for a mistrial based on the prosecutor's questioning concerning the accident report. The prosecutor responded by advising the district court that he had "a good faith general basis for the question." Transcript at 1089. Upon further questioning, the prosecutor asserted that "it is our understanding that reports like these can be quite frankly bought and sold for a price in Mexico." Transcript at 1090. Other defense counsel joined in the motion for a mistrial as to their clients, objecting that the prosecution's asserted basis was not a sufficient foundation for the questions posed to Valdemar. The district judge denied the motions.

---

**3.** The relevant questions asked by the Assistant United States Attorney and answers provided by Valdemar were as follows:

Q: In fact, Mr. Colin, isn't it true that you went to the police and in particular spoke with a police officer named Sebastian Guitan Hernandez *and purchased from him a police report?*

A: No sir. That is false.

Q: And *the police report that you purchased from that officer described an accident that, in fact, never happened,* isn't that right, Mr. Colin?

A: That's not true....

Q: My question, Mr. Colin goes not to alteration of documents but to whether *you, yourself, dictated to this police officer a report about an accident* on December 29th in Morelia, Mexico *that never happened?*

A: No sir.

Transcript at 1078–79 (emphasis supplied). Immediately after this line of questioning, the prosecution accused Valdemar of having coached a defense witness to lie on the stand in support of the alibi.

Later that day, in response to defense concerns about the possibility of future prejudicial prosecution questioning, the Assistant United States Attorney made further representations to the trial court concerning his basis for the questions he had put to Valdemar, saying that he would produce a witness or witnesses who would provide testimony "much more specific than just a general statement about corruption." Transcript at 1148. The testimony of this witness or witnesses, the Assistant predicted, would "be much more particularized, even perhaps to the facts of this case and the preparation of this report than a general statement about corruption in Mexico." *Id.* at 1148–49. The government never produced this witness.

On appeal, defendants assert that the district court erred in refusing to declare a mistrial following the prosecution's questioning of Valdemar. They rely on *United States v. Wolf,* 787 F.2d 1094 (7th Cir.1986) for the proposition that it is reversible error for prosecutors to ask questions accusing defendants of improprieties without establishing factual foundations for the questions. They also assert that the error prejudiced not only Valdemar Colin's defense as to Count 6, but all defendants as to all counts.

In response, the government argues that, though it is prosecutorial misconduct to ask questions for which the prosecutor has no factual foundation, the questioning here was based on "insight held by the prosecuting attorney," Brief at 23, and was justified by the wholly inconsistent nature of the facts before the jury as to where Valdemar spent the last week of December, 1986.

■ We cannot agree with the government that its questioning of Valdemar concerning the Mexican accident report was "fundamentally fair." Brief at 29. As we observed in *United States v. Harris,* 542 F.2d 1283, 1307 (7th Cir.1976), *cert. denied,* 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977), "[i]t is improper conduct for the Government to ask a question which implies a factual predicate which the examiner knows he cannot support by evidence . . . ."; *see also Wolf,* 787 F.2d at

1099 ("The entire line of questioning was improper; the prosecution was insinuating Wolf's guilt of another crime, which the government should have been but was not prepared to prove by clear and convincing evidence if it wanted to inject it into the case."); *United States v. Silverstein,* 737 F.2d 864, 868 (10th Cir.1984). Nor can we overlook the prosecutor's statement to the district court that he was prepared to produce a witness or witnesses to substantiate the allegations implicit in his questions to Valdemar. These statements lack support in view of the government's failure to produce this witness or witnesses or otherwise to substantiate in the trial record that there was a basis for the questions posed that went beyond the prosecutor's suspicions about Mexican police. Once the prosecutor represented to the district court that it had a witness to support the allegations contained in its questions, it should have backed up its statements with a more specific proffer of evidence.

■ To be sure, as we have recently observed, "the government does not have a duty in every case to introduce the factual predicate for a potentially prejudicial question posed on cross-examination." *United States v. Jungles,* 903 F.2d 468, 478 (7th Cir.1990). However, when, as in this case, the prosecution asks damning questions that go to a central issue in the case, these questions must be supported by evidence available or inferable, *see Jungles,* 903 F.2d at 478–79, from the trial record. In such a situation, neither a prosecutor's good faith belief that some basis for her question exists nor reassurances to appellate courts drawn from information never presented below will suffice. *See Harris,* 542 F.2d at 1308 ("To show its good faith, the Government cites materials it included in its appendix showing the factual basis for its questions. The materials are not part of the record in this case.").

Moreover, nothing we gleaned from the numerous statements outside the record made at oral argument by the same Assistant United States Attorney responsible for the critical questions at trial promotes the government's basis for its position. At

**1314**

oral argument and in its brief, the government sought to persuade this Court that it never promised the district judge that it would produce the supporting witness. This appears to be inconsistent with the statement the prosecutor made at trial to the district court: "[w]e have at least one other witness who's going to be arriving tomorrow morning.... the anticipated testimony of that witness or those witnesses is going to be much more specific than just a general statement about corruption.... It is going to be much more particularized, even perhaps to the facts of this case." Transcript at 1148. Furthermore, the government was unable to establish at oral argument that what the witness or witnesses would have said was, as the prosecutor had represented to the district court, "much more particularized, even perhaps to the facts of this case." [4]

Moreover, we reject the government's contention that the presence of a factual dispute like that which existed in this case justifies the use of questions unsupported by a factual basis. Clear factual disputes arise whenever an alibi defense is raised, and we are unwilling to hold that a criminal defendant subjects himself to calumny by presenting an affirmative defense. If prosecutors seek to poke holes in alibis, they may do so by introducing credible evidence, not through the kind of prejudicial questioning employed by the government in this case.

Finally, we note that the prosecution's intention of using surprise witnesses to rebut Valdemar's alibi defense seems inconsistent with the prosecutor's duty to provide the defendant with advance notice of the witnesses the government intended to use to rebut the alibi defense. Fed.R. Crim.Pro. 12.1(b); *see also id.*, Rule 12.1(c) (continuing duty to disclose alibi witnesses whose identities would have to be disclosed under 12.1(b)). Under Rule 12.1, the government may use surprise witnesses to rebut defense alibis only "if there is cause shown for the failure to conform to the

requirements of the rules." Fed.R.Crim. Pro. 12.1 advisory committee's note; *see United States v. Causey*, 834 F.2d 1277, 1283 (6th Cir.1987), *cert. denied*, 486 U.S. 1034, 108 S.Ct. 2019, 100 L.Ed.2d 606 (1988) (good cause for government non-disclosure of alibi rebuttal witness existed where notice was provided within 48 hours of time government learned of witness's potential testimony and within 24 hours of government's decision to call her, and physical safety and protection of potential witness justified earlier non-disclosure). We are unable to determine from the record whether the prosecution complied with Rule 12.1, and the issue has not been raised on appeal. It is difficult, however, to reconcile the government's plan to use the witnesses it promised the district court with Rule 12.1's advance notice requirement. As we read the record, the first time the defense learned the existence of the witness or witnesses was *after* the prosecution asked Valdemar the critical questions. If the government had a testimonial foundation for these questions, Rule 12.1(b) required it either to notify the defense of the witnesses it planned to call at the earliest opportunity or to establish good cause why no notification was given. *See Causey, supra.*

Though we disapprove of the prosecution's questioning of Valdemar, we nevertheless affirm the trial judge's decision not to grant a mistrial because we conclude that in light of other testimony presented at trial, the prosecutorial performance here does not amount to reversible error. Because defendants did not make a timely objection in the district court, our review is limited to the question of whether the prejudicial questioning amounted to plain error. Fed.R.Evid. 103(a)(1), 103(d); Fed.R.Crim. Pro. 52(b); *United States v. Brantley*, 786 F.2d 1322, 1327–38 (7th Cir.), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3284, 91 L.Ed.2d 572 (1986); *United States v. Kanovsky*, 618 F.2d 229, 231 (2d Cir.1980).

**4.** At oral argument, the Assistant United States Attorney appeared to concede that the information that would have been presented by the witnesses he asserted he was prepared to call

would have established no more than that certain police officers in the town where Valdemar's accident report had been issued were amenable to selling falsified accident reports.

"The plain error exception to the contemporaneous-objection rule is to be 'used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result.'" *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1, 12 (1985) (*quoting United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816, 827 n. 14 (1982)); *see also Wolf,* 787 F.2d at 1098 ("Plain error connotes not only clear error but also prejudicial error—error likely to have changed the outcome at trial."); *United States v. Requarth,* 847 F.2d 1249, 1254 (7th Cir.1988) ("A plain error is one that is 'not only palpably wrong but also likely to cause the outcome of the trial to be mistaken.'") (*quoting United States v. Kehm,* 799 F.2d 354, 363 (7th Cir.1986)). Moreover, "[e]specially when addressing plain error, a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record.... It is simply not possible for an appellate court to assess the seriousness of the claimed error by any other means." *Young,* 470 U.S. at 16, 105 S.Ct. at 1046–47, 84 L.Ed.2d at 13. In this case, improper though the questioning was, the record viewed as a whole leads us to conclude that the prosecution's questioning of Valdemar Colin does not rise to the level of plain error.

Defendants argue that the questioning defeated their attempt to exculpate defendants other than Valdemar by blunting their attempt to use the inconsistency between Valdemar's alibi and the testimony of government witnesses to discredit these witnesses. This argument seems to be directed more toward the exclusion of the accident report than the prejudicial questioning. Certainly the questioning hardly helped their defendants' attempt to convince the jury that all the witnesses who placed Valdemar in Milwaukee in the last week of 1986 were lying. However, before the improper questioning occurred, defendants were able to present Valdemar's alibi defense, both through testimonial and documentary proof. The only evidence they were not able to present to the jury was the accident report, which the district court excluded on hearsay grounds, a ruling that

defendants do not contest on appeal. The jury was presented with Valdemar's account of where he spent the last week of 1986 as well as the prosecution's over-zealously presented doubts about Valdemar's story. It was, in other words, left to draw its own conclusions about whether Valdemar was in Milwaukee or Morelia, and, by extension, whether the prosecution witnesses placing him in Milwaukee were credible.

■ The defendant most directly affected by the improper questioning was Valdemar himself, the witness to whom the questions were addressed and whose credibility was directly challenged by them. Valdemar implicitly directs our inquiry to the sufficiency of the evidence supporting the conclusions the jury did reach, and whether a reasonable jury could have convicted even had it accepted Valdemar's alibi defense. In analyzing a challenge to the sufficiency of the government's evidence,

we ask whether '*any* rational trier-of-fact could have found the essential elements of the crime beyond a reasonable doubt.' *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). Furthermore, we view the evidence in the light most favorable to the government in making this determination.

*United States v. Skidmore,* 894 F.2d 925, 928 (7th Cir.1990) (citation omitted). Applying that standard, we conclude that rational jurors could have convicted Valdemar even believing the alibi tendered by Valdemar that was attacked in the government's prejudicial cross-examination.

Defendants rely on *United States v. Wolf,* 787 F.2d 1094 (7th Cir.1986), where we reversed a Mann Act conviction because of a series of improper prosecution questions demeaning to the defendant in that case. As in *Wolf,* we have determined that the cross-examination here was improper. "[I]t is a separate question whether [the improprieties] were prejudicial" with respect to Count 6 and the other counts under which Valdemar was charged. *Id.* Also as in *Wolf,* the improper questioning here related to an issue upon which there was substantial factual dispute, making the

credibility of the improperly questioned defendant "critical." *Wolf,* 787 F.2d at 1099.

In *Wolf,* we held that the improper cross-examination had denied Wolf a fair trial because their demeaning nature detracted from his credibility. We made that determination as to a count in Wolf's indictment concerning his alleged encouragement of Chenda Or to move to Indiana for immoral purposes. *Id.* at 1096–97. Probative evidence of Wolf's intent was the fact that, once Ms. Or reached Indiana, Wolf initiated a sexual relationship with her. This evidence was provided by Ms. Or, a witness who, we observed, "had a history of serious mental and physical illness and some of [whose] testimony ... was sufficiently improbable to raise doubts about her credibility." *Id.* at 1099. "This in turn made Wolf's own credibility critical. If the jury had believed his testimony it would have had to acquit him. It might have done so but for the improper destruction of his credibility by the prosecutor." *Id.*

We note defendants' contention that, as in *Wolf,* some of the evidence linking Valdemar with the events charged in Count 6 was provided by Alma Garay, a witness whom the district judge, speaking out of the jury's hearing, found to be less than completely credible. Transcript at 898. Unlike in *Wolf,* however, the testimony of the non-credible witness here, Alma, was supported by the testimony of other witnesses, Tom Koss and the Morgans, witnesses who, so far as the record reflects, evinced no similar credibility problems. Defendants also note that the government's case as to Count 6 and the rest of the charged offenses depended almost exclusively on the testimony of co-conspirators who chose to cooperate with the prosecution. What this overlooks is that the most important witness the government presented on the alibi issue was neither a co-conspirator nor a law enforcement official. He was a realtor who testified that on New Year's Eve 1986 he had met with Valdemar concerning the purchase of property in Milwaukee. While the realtor's testimony that he had met with Valdemar in Milwaukee in New Year's Eve did not directly contradict Valdemar's testimony that

he was in Mexico two days earlier, it did cast further doubt on the veracity of the alibi, especially since it came from a witness with no prior involvement with Valdemar or the government.

Also unlike *Wolf,* this is not a case where a jury believing Valdemar's alibi would have to acquit him even as to Count 6. The evidence at trial described Valdemar's activities in Wisconsin after New Year's Eve, including the repackaging and distribution of the marijuana and the receipt of payments made in exchange for the marijuana. Moreover, even if the jury had accepted the alibi the accident report was intended to support, it would still have ample evidence linking Valdemar to the first five counts. Valdemar's four transfers of marijuana to Arturo, and Valdemar's knowledge of the involvement of others in the transportation, storage, and distribution of this marijuana also sufficed to establish his participation in a conspiracy to distribute a controlled substance. And Arturo's testimony that on four separate occasions (corresponding to counts 2 through 5) he obtained physical custody of large quantities of marijuana from Valdemar established Valdemar's liability on the first four substantive counts except Count 6. Furthermore, the government supported important details in its case as to all counts with physical evidence, such as records of phone calls between Valdemar and Arturo Garay and of marijuana-for-cash transactions between Koss and Valdemar. Given the strength of this evidence, we conclude that, improper though it was, the prosecution's questioning of Valdemar did not change the outcome at trial.

### III. PINKERTON INSTRUCTION

■ Defendant's second allegation of error relates to the *Pinkerton* instruction given by the trial court.

Under the *Pinkerton* doctrine ... a conspirator can be found guilty for a co-conspirator's crimes but the jury must be instructed on this theory of guilt.... The doctrine is based on the idea that the conspirators are agents of each other

and just as a principal is bound by the acts of his agents within the scope of the agency, so is a conspirator bound by the acts of his co-conspirators.

*United States v. Troop,* 890 F.2d 1393, 1399 (7th Cir.1989) (citations omitted); *see also Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489, 1496 (1946); *United States v. Auerbach,* 913 F.2d 407, 410, n. 2 (7th Cir.1990).

The trial judge instructed the jury that:

A conspirator is responsible for offenses committed by his fellow conspirators, if he was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of or as a natural consequence of the conspiracy.

Transcript at 1349. This is the first paragraph of this Circuit's two-paragraph *Pinkerton* instruction. 3 Federal Criminal Jury Instructions of the Seventh Circuit 6 (1986). The second paragraph, which the trial judge omitted from the charge it gave the jury in this case, provides:

Therefore, if you find a defendant guilty of the conspiracy charged in Count(s) ___ and if you find *beyond a reasonable doubt* that while he was a member of the conspiracy, his fellow conspirator(s) committed the offense(s) in Count(s) ___ in furtherance of or as a natural consequence of that conspiracy, then you should find him guilty of Count(s) ___.

*Id.* (emphasis supplied). All defendants made timely objections to the *Pinkerton* instruction given by the district court. These objections were overruled. On appeal defendants allege that the abbreviated instruction deprived defendants of a fair trial on the substantive possession counts because it failed to remind the jurors that they must find beyond a reasonable doubt that, at the time the vicarious acts occurred, the defendant in question was a member of the conspiracy and that the act was in furtherance of the conspiracy.

This Circuit recently rejected a *Pinkerton* instruction identical to the one given by the district court here. *See United States v. Camargo,* 908 F.2d 179, 184 n. 2 (7th Cir.1990).[5] The "half-*Pinkerton*" instruction given in this case was "drastically compressed," *United States v. Manzella,* 791 F.2d 1263, 1268 (7th Cir.1986), and failed to advise jurors that the government bore the burden of proving that all elements of the powerful *Pinkerton* doctrine must be proven beyond a reasonable doubt. *Cf. Francis v. Franklin,* 471 U.S. 307, 313, 105 S.Ct. 1965, 1970, 85 L.Ed.2d 344, 352 (1985).

Though we agree that the *Pinkerton* instruction here was inadequate, we find the error to have been harmless. Here, as in *Camargo,* the government's case did not rely solely on the *Pinkerton* doctrine of vicarious co-conspirator liability. *Camargo,* 908 F.2d at 184. Alternative theories of direct and vicarious liability raised below exist for affirming the substantive-count convictions despite the defective Pinkerton instruction. As to Valdemar Colin, the testimony of Arturo Garay, Alma Garay, Tom Koss, and the Morgans concerning transfers of marijuana Valdemar made were sufficient for a reasonable jury to convict him under Counts 2, 4, 5, and 6. *See United States v. Flynn,* 664 F.2d 1296, 1307 (5th Cir.) *cert. denied,* 456 U.S. 930 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982) ("Possession of contraband may be proven by evidence (1) that defendant was in control of a conveyance and (2) that the conveyance was known by him to contain contraband."). Similarly, Victor Elizondo's services as driver of marijuana-laden vehicles in Counts 4 and 5 establish his actual possession. *Id.*

■ Defendant Fernando Rodriguez's conviction is supportable on the theory that he aided and abetted the actual possession of others. "One who participates in a criminal adventure and seeks by his actions to make it succeed commits the crime of aiding and abetting." *United States v. Wes-*

---

5. In *Camargo,* we rejected the government's attempt to assert the *Pinkerton* doctrine as an alternative theory justifying a conviction for possession that was also supportable on a theory of constructive possession. *See Camargo,* 908 F.2d at 184 & n. 2.

*son,* 889 F.2d 134, 135 (7th Cir.1989). Aiders and abettors are liable as principals. 18 U.S.C. § 2(a). The evidence concerning Count 4 established that Fernando contacted Tom Koss to arrange storage for the marijuana Valdemar transferred in Bloomington, escorted the truck driven by Elizondo on the highway back to Milwaukee, and unloaded the truck at Koss's house. This evidence establishes both participation in the criminal endeavor alleged in Count 4 and actions intended to make the endeavor succeed.[6]

## IV. USE OF EVIDENCE RELATED TO DISMISSED COUNT 3

Defendant's third allegation of error relates to the jury's use of evidence relevant to a dismissed count. At the close of the government's case, the district judge dismissed Count 3 of the indictment. The judge found that, while the indictment stated that the acts charged in Count 3 took place in October, 1984, the proof adduced at trial concerned acts occurring six months later, in March 1985. According to the district court, this amounted to an impermissible variance.[7]

At the close of the presentation of evidence, defense counsel requested that the trial judge instruct the jury that it could not consider evidence relating to the third count in its consideration of the conspiracy count or the other substantive counts. The judge denied the motion, allowing the jury "to consider any evidence that would be within the time framework of the dates alleged in the conspiracy count only as it relates to the conspiracy." Transcript at 1191–92.

After the jury began deliberations, it sought further instruction from the trial judge on the question of whether it could consider witness testimony relating to Count 3 "to help us decide other facts in Charge Four." Transcript at 1372. After soliciting the views of counsel, the judge repeated a portion of his prior jury instructions, reminding the jury that:

> Each count of the indictment charged the defendant with having committed a separate offense. You must give separate consideration both to each count and to each defendant. You must consider each count and the evidence relating to it separate and apart from every other count. You should return a separate verdict as to each defendant and to each count. Your verdict of guilty or not guilty of an offense charged in one count should not control your decision as to that defendant under any other count.

Following this reiteration, the trial judge told the jury that "probably the short and most simple answer to your question is no." He went on to add, however, that:

> evidence that was adduced during the trial that would have been relevant to Count Three can be used by you with respect that determinations that you have to make on the overall conspiracy charge. Furthermore, there's a doctrine they call collateral estoppel in the law, and there is some—a *Rule 404(b)* that leads me to add that depending on what the issue is that caused you to ask the question, *evidence from Count Three that was dismissed could be used if it was of value to you in determining questions of motive, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.*

Transcript at 1387–89 (emphasis supplied). Defendants objected to this instruction.

On appeal, defendants argue that the instruction was defective for three reasons: it erroneously allowed the jury to consider Count 3 evidence in evaluating the evidence relating to Count 4 and the remaining substantive counts, it encouraged the jury to consider Count 3 evidence as it related to the conspiracy count, and it unnecessarily confused the jury. The prosecution responds that the nature of conspiracies is that they are ongoing and continuous and that courts routinely allow uncharged evi-

---

6. We postpone our discussion as to the sufficiency of the evidence with respect to Juan Carlos Colin's conviction on Count 5 until Part V of the opinion.

7. We express no opinion as to the correctness of this ruling.

dence to be used to substantiate a conspiracy count. As to the jury's use of Count 3 evidence as it relates to the other substantive counts, the prosecution contends that the district court correctly decided whether to admit the Count 3 evidence by applying the standard used for the admission of evidence of "other crimes, wrongs, or acts" set out in Fed.R.Evid. 404(b).

As counsel for one of the defendants noted in discussing the proposed instruction with the judge, the set of facts presented is "rather unusual."[8] Transcript at 1374. We share defendants' concern that counts of an indictment dismissed at the close of the prosecution's case could be resuscitated by an open invitation to the jury to consider evidence pertinent to the dismissed count in resolving other counts. We are also concerned that "the somewhat atypical procedural developments" in this case led to the admission of "bad acts" testimony absent "a detailed assessment of the evidence presented in support of [the dismissed count] under the standards articulated in *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984)." Government Brief at 37.

■ Nonetheless, on the facts of this case we decide that the district court's instruction to the jury was proper. The instruction given the jury here raises two distinct issues, first, the use of the Count 3 evidence in support of the conspiracy charged in Count 1, and second, the use of the Count 3 evidence in support of the other substantive counts, particularly Count 4. The first question is the easier of

the two; as we have observed, "[e]vidence of overt acts which occurred after a conspiracy was formed and which were related to the object of the conspiracy is admissible regardless of whether the overt acts are charged in the indictment." *United States v. Harris*, 542 F.2d 1283, 1300 (7th Cir. 1976), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977); *see also United States v. Read*, 658 F.2d 1225, 1239 (7th Cir.1981); *United States v. Greichunos*, 572 F.Supp. 220, 224 (N.D.Ill.1983). Had the government chosen before trial not to charge Count 3 at all but simply to elicit testimony concerning an uncharged drug transaction that supported its conspiracy allegations, *Harris* and the cases following it would support an affirmance. These cases put defendants here on notice that the Count 3 evidence could be used by the jury in deciding whether to convict on the conspiracy count even after that count had been dismissed.

■ The specific question posed by the jury, however, related to the second of our two inquiries, the use of the Count 3 testimony to decide the question of defendants' guilt or innocence on the remaining substantive counts. Three factors convince us that the jury instruction permitting the use of the Count 3 testimony was not error. First, we note that the challenged instruction was immediately preceded by a repetition of the trial judge's prior instruction that the jury must separately consider each count and the evidence relating to that count. Thus, the jury was reminded not to

---

8. So unusual, in fact, that the parties have called our attention to only one other case posing the issue, *United States v. Finnerty*, 470 F.2d 78 (3d Cir.1972). In *Finnerty*, defendant was charged with passing counterfeit currency. The indictment was in two counts, each relating to one incident in which Finnerty attempted to purchase goods using counterfeit bills. The first count was dismissed for insufficiency of the evidence, and the question on appeal was whether the jury could use evidence from the dismissed count to decide the remaining count. Because of the spatial and temporal proximity of the two acts, Judge McLaughlin, in a plurality opinion, indicated that evidence from the dismissed count could be admitted to show defendant's knowledge that the bills he was passing were counterfeit. 470 F.2d at 79–80.

While the dismissed count in *Finnerty* was tied more closely to the remaining charged conduct than the dismissed count here, the dismissal of Count 1 in that case was for insufficiency of the evidence, a basis which raises greater questions concerning the appropriateness of jury consideration of evidence pertaining to the dismissed count. Here, by contrast, the dismissal was for variance, a ground which does not involve a finding by the trial court that the evidence was insufficient to convict. *Cf. United States v. Scott*, 437 U.S. 82, 96, 98 S.Ct. 2187, 2196, 57 L.Ed.2d 65, 77 (1978) (allowing reprosecution following a dismissal where basis of dismissal was defendant's "legal claim that the Government's case against him must fail even though it might satisfy the trier of fact that he was guilty beyond a reasonable doubt.").

aggregate all the evidence in the case and instead to conduct individualized determinations with respect to each defendant and each count. The fact that the jury acquitted Juan Carlos Colin on Counts 4 and 6, Alejandro Rodriguez on Count 4, and Fernando Rodriguez on Count 6 suggests that they heeded this instruction.

Second, the trial judge limited the jury's use of the Count 3 evidence to the categories enumerated in Rule 404(b).[9] While a specific instruction to the jury that they should not consider the Count 3 testimony as probative of a propensity to commit crime would have been preferable, the jury's use of the evidence was cabined by the trial judge's enumeration of the Rule 404(b) categories.

The third and final factor persuading us that the instruction to the jury that it could consider the evidence related to Count 3 in its consideration of the other substantive counts is that the Count 3 evidence satisfies the four-part standard for the admission of Rule 404(b) evidence set out by this Circuit in *United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984); *see also United States v. Khorrami*, 895 F.2d 1186 (7th Cir.1990). Under the *Shackleford* test,

> admission of evidence of prior or subsequent acts will be approved if (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue ... (3) the evidence is clear and convincing,[10] and (4) the probative value of the evidence is not sub-

stantially outweighed by the danger of unfair prejudice.

*Shackleford*, 738 F.2d at 776, 779.

Applying these factors here, the testimony elicited in support of Count 3 suggested the use of a common plan, one of the Rule 404(b) categories the jury was instructed by the trial judge that the evidence could be used for. There is no requirement that acts used to show the existence of a common scheme or plan be identical, just that the charged and uncharged prior events "have sufficient points in common." *United States v. Hudson*, 884 F.2d 1016, 1021 (7th Cir.1989); *cert. denied*, — U.S. —, 110 S.Ct. 3221, 110 L.Ed.2d 668 (1990); *see also United States v. Nolan*, 910 F.2d 1553, 1561 (7th Cir.1990); *United States v. Zapata*, 871 F.2d 616, 621 (7th Cir.1989); *United States v. Radseck*, 718 F.2d 233, 236 (7th Cir.1983) *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984).

That standard was met here. While the facts alleged in Count 2, the initial transaction engaged in by the conspiracy, are somewhat unique, the facts supporting Counts 3, 4, and 5 share important features. In each of these counts Valdemar Colin brought marijuana from Mexico and transferred it to one of a small group of associates at a motel in the lower Midwest. One of three associates drove the marijuana to the Milwaukee area, and stored at one of two sites. On the associate's trip north he was escorted by another conspirator. Counts 3 through 6 occurred over a period of 22 months, but counts 3, 4, and 5 took place over approximately three months, March through June 1985. We think this pattern shows sufficient similarity to satisfy the standard of Rule 404(b).

The similarities between Counts 3 and 4, the focus of the jury's question to the trial

---

9. We note that these categories are not exclusive. *See* Fed.R.Evid. 404(b) (evidence of other crimes, wrongs, or acts may be admitted for purposes *"such as* proof of motive, opportunity, intent...."*) (emphasis supplied).

10. Since we decided *Shackleford*, the Supreme Court has held that there need be no prior inquiry into the admissibility of "similar act" and other Rule 404(b) evidence and that the question of admissibility under Rule 404(b)

should be guided solely by the relevance of the evidence, noting that "[i]n the Rule 404(b) context, similar act evidence is relevant only if the jury can reasonably conclude that the act occurred and that the defendant was the actor." *Huddleston v. United States*, 485 U.S. 681, 689, 108 S.Ct. 1496, 1500, 99 L.Ed.2d 771, 782 (1988); *see Khorrami*, 895 F.2d at 1194 n. 3; *United States v. Connelly*, 874 F.2d 412, 415 n. 5 (7th Cir.1989).

judge, are even more striking. The facts underlying the two counts take place weeks apart. In both cases the marijuana transfer was effectuated by Valdemar's handing over the keys to a U–Haul truck to Arturo Garay. In Count 3, Garay drove the truck himself, escorted by Fernando Rodriguez. In Count 4, Elizondo drove the truck, with Arturo Garay and Fernando Rodriguez providing the escorts. In both counts, the marijuana's first stop in the Milwaukee area was Tom Koss's garage.

The evidence here also satisfies the *Huddleston* standard of proof. The person who brought together Valdemar Colin and the other participants in the marijuana shipment involved in Count 3 was Arturo Garay, who testified at trial as to his meeting with Valdemar. His testimony concerning the unloading of the marijuana in Milwaukee was supported by testimony concerning the same events provided by Tom Koss, in whose garage the marijuana was stored. Both witnesses were cross-examined by defense counsel. This evidence is sufficient for a jury reasonably to conclude that the acts alleged in Count 3 occurred and that Valdemar Colin and Fernando Rodriguez committed those acts.

Turning to the last *Shackleford* factor, the evidence pertaining to Count 3 was clearly no more or less prejudicial than evidence pertaining to any of the substantive counts that remained in the case. There is no suggestion that the Count 3 evidence was presented in a sensational manner: the government, thinking during its case in chief that the Count would go to the jury, presented it in the same manner as the other substantive counts.

## V. SUFFICIENCY OF THE EVIDENCE TO CONVICT JUAN CARLOS COLIN

■ The final issue raised on appeal relates to the sufficiency of the evidence to convict one of the defendants, Juan Carlos Colin, under Counts 1 and 5 of the indictment. We have already discussed our standard when reviewing jury verdicts challenged on the ground of insufficient evidence. *Ante* at 1315. Applying this standard, we conclude that there was sufficient evidence to support the jury's finding that Juan Carlos Colin was a member of a conspiracy whose aim was the possession and distribution of marijuana, and that Juan Carlos himself possessed marijuana with intent to distribute.

The evidence against Juan Carlos Colin was, first, that he had accompanied his father Valdemar to the motel where Valdemar transferred the keys to a marijuana-laden truck to Arturo Garay as part of the transaction charged in Count 4. Juan Carlos's role in the facts underlying Count 5 was that he and Victor Elizondo drove away from the Ohio hotel where Arturo and Elizondo met Valdemar. ·Arturo testified at trial that Elizondo later told him that Elizondo and Juan Carlos had driven to a storage facility where Valdemar was storing marijuana. Juan Carlos and Elizondo returned two hours after they left, their automobile loaded with marijuana. In Count 6, Juan Carlos visited Valdemar at the Morgan's farm during Valdemar's stay there. After Valdemar left the Morgan farm, in early 1987, Juan Carlos received over $250,000 in cash payments for marijuana from Tom Koss and Alma Garay. After Tom Koss was arrested, Juan Carlos visited him and accused him of leading the police to Alma Garay.

The evidence that Juan Carlos Colin was present when Elizondo, with or without Juan Carlos's help, loaded an automobile with marijuana might not, standing alone, suffice as a basis for a conspiracy conviction. Other evidence against Juan Carlos, however, clearly supports his conviction on the conspiracy charge, particularly the testimony of both Tom Koss and Alma Garay that Juan Carlos accepted large sums of cash from them in return for marijuana they had obtained from Valdemar. These two transactions suggest a pattern in which buyers paid Juan Carlos who turned funds over to his father Valdemar, a method of operations suggestive of Juan Carlos's role in a conspiracy. *See United States v. Dalzotto*, 603 F.2d 642, 646 (7th Cir.1979), *cert. denied*, 444 U.S. 994, 100 S.Ct. 530, 62 L.Ed.2d 425 (1979). And Juan

Carlos's accusation of Tom Koss reflects a concern with the fate of members of the conspiracy that also suggests a role in its activities. *See United States v. Marks*, 816 F.2d 1207, 1212 (7th Cir.1987).

Juan Carlos's reliance on *United States v. Williams*, 798 F.2d 1024 (7th Cir.1986), is misplaced. In *Williams*, the issue presented was whether the nonhearsay evidence presented concerning the existence of a conspiracy was strong enough to have allowed the trial judge to allow co-conspirator statements to be admitted against her under Fed.R.Evid. 801(d)(2)(E). That issue is not relevant to this case; the "independent evidence" rule that underlay the decision in *Williams* has been abandoned in favor of a rule that allows district court judges to use hearsay statements in determining the existence of a conspiracy for the purpose of deciding whether the hearsay exception provided in Rule 801(d)(2)(E) is applicable. *See Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2782, 97 L.Ed.2d 144, 156 (1987) ("[A] Court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted."); *United States v. Troop*, 890 F.2d 1393, 1403 (7th Cir.1989). In *Williams*, moreover, the non-hearsay evidence was held insufficient to support a conviction because all it established was Debbie Williams' presence at the scene of drug transactions. Here, as discussed above, the evidence at trial established Juan Carlos's active participation in various facets of the conspiracy.

The evidence of Juan Carlos Colin's role in Count 5, the only substantive count under which he was convicted, was based solely in the testimony of Arturo Garay. At trial, Arturo testified that when he met Valdemar at a motel in Ohio in mid–1985, Valdemar had stored marijuana at "some warehouse or some type of a storage house" near the motel. During the meeting between Arturo and Valdemar, Juan Carlos drove up. Juan Carlos "made arrangements with [Elizondo] to go with him," to the place where the marijuana was stored. Transcript at 182. Later, Elizondo told Arturo that "he was with Juan Carlos at some [ ] warehouse or garage or something" and had loaded the car with marijuana. Transcript at 185.

We find this evidence sufficient to sustain a conviction. The evidence shows that Juan Carlos Colin and Elizondo drove in a car to a location where marijuana was stored and returned with the same car, now loaded with marijuana. Drawing all reasonable inferences in favor of the government, the jury would not be acting irrationally if it were to infer that, at a minimum, Juan Carlos assisted Victor Elizondo's subsequent possession through his services as a lookout. "Possession ... may be established by circumstantial or direct evidence." *United States v. Staten*, 581 F.2d 878, 883 (D.C.Cir.1978); *see United States v. Gardea Carrasco*, 830 F.2d 41, 45 (5th Cir.1987); *United States v. Montes–Cardenas*, 746 F.2d 771, 778 (11th Cir.1984). Moreover, possession may be joint, requiring that two or more of defendants share rights of dominion and control over drugs, *United States v. Brett*, 872 F.2d 1365, 1369 (8th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 322, 107 L.Ed.2d 312 (1989), a situation that a jury could have found to have existed when Elizondo and Juan Carlos drove the marijuana back from storage to the motel where Valdemar and Arturo Garay waited.

## VI.

For the foregoing reasons, the convictions of all defendants on all counts are

AFFIRMED.