STATE of Wisconsin, Plaintiff-Respondent,

v.

Bryan HOOVER, Defendant-Appellant.†

Court of Appeals

*No. 02–1687–CR. Submitted on briefs March 26, 2003.—
Decided May 28, 2003.*

2003 WI App 117

(Also reported in 666 N.W.2d 74.)

† Petition to review denied 8-13-03.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Glenn L. Cushing*, assistant state public defender, Madison.

. On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Eileen W. Pray*, assistant attorney general, and *James E. Doyle*, attorney general.

Before Nettesheim, P.J., Anderson and Snyder, JJ.

¶ 1. ANDERSON, J. Bryan Hoover appeals a judgment of the trial court convicting him of first-degree intentional homicide, party to a crime, contrary to Wis. Stat. §§ 940.01(1) and 939.05, and conspiracy to hide a corpse contrary to Wis. Stat. §§ 940.11(2) and 939.31 (2001–02).[1] He also appeals the trial court order denying him postconviction relief. Hoover argues that his constitutional right to confront and cross-examine witnesses testifying against him was violated by the trial court's rulings and/or trial counsel's deficient performance or confusion over what questioning was permissible. He also argues that the trial court deprived him of his due process right to a fair trial and unconstitutionally relieved the State of its burden of proof by substantially modifying the pattern jury instruction on party to a crime liability. With both arguments, we disagree. Accordingly, we affirm.

## Background

¶ 2. At trial, several witnesses testified against Hoover, including Lyda Antia Morris (Antia) and her husband Richard Morris (Morris). The following evidence was presented. Hoover, Antia and Morris were involved in the murder of Frederick Jones and the subsequent conspiracy to conceal Jones's corpse on November 30 and December 1, 1995. Antia lived with Morris and during that time Hoover was staying with them. On November 30, the three decided to beat up Jones because he had allegedly sold Morris bad cocaine. The three tried to contact Jones, who eventually came over to the apartment.

¶ 3. After Jones's arrival at the apartment, Hoover and Morris began to beat him up. At some

---

[1] All references to the Wisconsin Statutes are to the 2001–02 version.

point, Morris put Jones in a bear hug and at some point, Hoover hit Jones in the head with a golf club. After Jones was dead, Morris removed six condoms, $200 and a .357 gun from his body. The three contacted a friend, Tywon Knight, because he had a car and they wanted his help in disposing of Jones's body. Morris and Hoover then wrapped the body in a blanket and, with the help of Knight, put the body into the trunk of Knight's car.

¶ 4. Antia, Hoover and Morris dropped Knight off at a relative's apartment, but kept Knight's car in order to drive Jones's body to Chicago. In Chicago, they purchased lighter fluid using the money they had stolen from Jones. It was approximately 2:00 a.m. when they drove to the rear of an abandoned school, parked the car and removed Jones's body from the trunk. Morris opened the blanket and squirted lighter fluid onto Jones's body and onto the blanket. Morris then lit the body on fire. Thereafter, the three drove to a nearby alley and watched Jones's body burn.

¶ 5. On December 1, 1995, pathologist Lary Simms, Deputy Medical Examiner in Cook County, Chicago at that time, examined Jones's body. Simms testified to two causes of death: First, he noted cranial cerebral injuries consisting of "sharp force wounds" on Jones's forehead, which fractured his skull and drove the bone of the skull into the brain causing damage to the brain. He stated that these injuries were "definitely consistent" with being caused by an iron golf club and that these injuries "in and of [themselves] would be sufficient" to cause death. Second, he stated that the hyoid bone had been fractured from manual strangulation, which would also have been sufficient to cause death.

614

## Discussion

¶ 6. *Right of Confrontation.* Hoover contends that the trial court's rulings and/or his defense counsel's deficient performance or confusion violated his constitutional right to confront and cross-examine witnesses testifying against him. A Wisconsin criminal defendant's right to confront witnesses is guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution[2] and article I, section 7 of the Wisconsin Constitution.[3] The confrontation rights under both constitutions are the same. *State v. Burns*, 112 Wis. 2d 131, 144, 332 N.W.2d 757 (1983). The right of confrontation includes the right to cross-examine adverse witnesses to expose potential bias. *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79 (1986). Although a court may not prohibit all inquiry into the possibility of bias, reasonable limitation on "interrogation that is repetitive or only marginally relevant" is appropriate. *Id.* at 679. The fundamental inquiry in deciding whether the right of confrontation was violated is whether the defendant had the opportunity for effective cross-examination. *See Delaware v. Fensterer*, 474 U.S. 15, 19–20 (1985); *State v. Pulizzano*, 155 Wis. 2d 633, 645, 456 N.W.2d 325 (1990).

[2] The Sixth Amendment to the United States Constitution provides in part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." The Sixth Amendment applies to the states by virtue of the Fourteenth Amendment. *See Pointer v. Texas*, 380 U.S. 400, 406 (1965).

[3] Article I, section 7 provides in part: "In all criminal prosecutions the accused shall enjoy the right . . . to meet the witnesses face to face."

¶ 7. Generally, the decision whether to admit or exclude evidence is within the circuit court's discretion. *State v. Williams*, 2002 WI 58, ¶ 7, 253 Wis. 2d 99, 644 N.W.2d 919, *reconsideration denied,* 2002 WI 121, 257 Wis. 2d 123, 653 N.W.2d 894 (Wis. Oct. 24, 2002) (No. 00–3065–CR). However, this discretion may not be exercised until the court has accommodated the defendant's right of confrontation. *See State v. George*, 2002 WI 50, ¶ 16 n.17, 252 Wis. 2d 499, 643 N.W.2d 777. Whether the limitation of cross-examination violates the defendant's right of confrontation is a question of law that we review de novo. *See Williams*, 253 Wis. 2d 99, ¶ 7.

¶ 8. When considering an ineffective assistance of counsel claim, we review the circuit court's findings of fact regarding counsel's conduct under a clearly erroneous standard. *State v. Swinson*, 2003 WI App 45, ¶ 57, 261 Wis. 2d 633, 660 N.W.2d 12. Whether those facts constitute deficient performance and prejudice are questions of law that we review independently. *Id.*

¶ 9. The test for ineffective assistance of counsel has two prongs: (1) a demonstration that counsel's performance was deficient, and (2) a demonstration that the deficient performance prejudiced the defendant. *Id.* at ¶ 58; *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To prove deficient performance, a defendant must establish that his or her counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The defendant must overcome a strong presumption that his or her counsel acted reasonably within professional norms. *Swinson*, 261 Wis.

616

2d 633, ¶ 58. To satisfy the prejudice prong, the defendant must show that counsel's errors were serious enough to render the resulting conviction unreliable. *Id.*; *Strickland*, 466 U.S. at 687. We need not address both components of the test if the defendant fails to make a sufficient showing on one of them. *Id.*

¶ 10. Hoover argues that his constitutional right to confront and cross-examine witnesses testifying against him was violated by the trial court's rulings, and/or trial counsel's deficient performance or confusion over what questioning was permissible. Specifically, Hoover contends a violation of his constitutional right to confront and cross-examine Maurice Anderson-El, who testified that Hoover told of his involvement in Jones's homicide while Anderson-El and Hoover were inmates in the Kenosha County Jail. We hold that Hoover's constitutional right to confront and cross-examine Anderson-El was not violated by the trial court's rulings, nor was it violated by trial counsel's deficient performance or confusion. Our review of the record reveals that the trial court accommodated Hoover's right of confrontation and Hoover has not shown that his counsel's performance was deficient. Additionally, Hoover has not persuaded us that a new trial is warranted in the interests of justice due to confusion on his counsel's part.

¶ 11. Before Hoover's trial, Anderson-El's plea hearing took place and the hearing transcript reveals that the State did not give Anderson-El a deal in exchange for his testimony. Additionally, there was no mention of his cooperation, his statement or his potential testimony. In his appellate brief, Hoover concedes "it is undisputed that Anderson-El was not directly offered his plea bargain in exchange for either his

information or his testimony, and that he came forward with his information on his own."

¶ 12.　Prior to Anderson-El's testimony, the trial court held several discussions with defense counsel and the prosecutor outside the presence of the jury concerning the appropriate scope of cross-examination. Defense counsel argued that he should be able to question Anderson-El about what defense counsel characterized as "the break" Anderson-El received in sentencing as a result of his statement.

¶ 13.　The trial court disagreed, expressing concern that questions regarding Anderson-El's sentence could confuse the jury into believing that the court had somehow rewarded Anderson-El for his potential testimony. Specifically, the court responded: "The break has to come from the prosecutor, not from the Court. The considerations the Court applies are not a *quid pro quo*." The court explicitly disallowed questions concerning the sentence imposed to avoid confusing the jury into believing that the court had participated in plea negotiations and gave Anderson-El a "break" in his sentence in exchange for his testimony.

¶ 14.　However, the court did not prohibit questions concerning the terms of the plea agreement. Rather, the court suggested that questions concerning the plea agreement would be appropriate. The court authorized defense counsel to question Anderson-El about his motivation for testifying and whether Anderson-El thought he might get something out of the State in the way of a reduced sentence recommendation, even though it was not part of any specific deal. The court stated:

> Court Judges do not participate in sentence negotiations. So to the extent that any of your questioning would imply that, that certainly would be inappropri-

ate. *What [Anderson-El's] expectations from the State recommendations are I think you can go into. If he was expecting because of his cooperation to get a break from the State, that's fine.* But I don't want it implied that because of his cooperation he was anticipating a break from the Court.

. . . .

[T]here's a difference between a sentencing consideration made by a Court and in effect a contract made between the State and a defendant for the State being committed to a position. *And if he thinks that because of the State's position he receives a benefit, that's fine. That I think you can go into. The State promised to make a recommendation of x number of years in part due to my cooperation, is fair game.* But to imply that the Court participated in that . . . . (Emphasis added.)

Defense counsel then asked for and received further clarification:

[Defense Counsel] Am I going to be able to - - if he says; I wasn't expecting a break, or I was expecting a break but I didn't get a break, am I able to then explain to the jury what kind of sentence he received?

[Court] No. Because the sentence is what the Court imposes. The recommendation is the break. And that's the distinction I drew yesterday and that's the distinction I make today.

[Defense Counsel] All right.

[Court] What the benefit of the bargain is, is from the District Attorney, not from the Court.

[Defense Counsel] All right.

¶ 15. In addition, immediately before Anderson-El's testimony, the court reiterated to defense counsel

that it was not preventing cross-examination regarding Anderson-El's perception of what benefit he might receive for his testimony:

> [I]f you want to ask him . . . do you think that if you testified today you may, although you're not—the State hasn't agreed to give you anything, you may get some benefit, you can ask him that.

¶ 16. With this clarification given, the State called Anderson-El, who testified that Hoover admitted to him his involvement in Jones's homicide while he and Hoover were inmates in the Kenosha County Jail. During Anderson-El's cross-examination testimony, the only question to which the State objected was whether Anderson-El thought the charges were "very serious."[4] The court sustained the objection without explanation. Defense counsel followed up this question by asking Anderson-El whether he was concerned about the charges, to which there was no objection.

¶ 17. The trial transcript reveals a number of added ways that Anderson-El's potential bias was put before the jury: (1) the jury was informed that Anderson-El had ten prior convictions; (2) Anderson-El testified that when he came forward with his statement, he was in the Kenosha County Jail facing charges; (3) at defense counsel's request, the court took judicial notice that the date of Anderson-El's initial appearance on his criminal charge coincided with the date he said that Hoover made admissions to him; (4) defense counsel cross-examined Anderson-El about jailhouse snitches and the fact that snitches generally hope to get some-

---

[4] At the postconviction motion hearing, the prosecutor explained that his objection was "based on the fact the defendant [was] not in a position to be able to characterize whether charges are serious or not."

thing for their testimony; and (5) defense counsel questioned Anderson-El about his personal motivation for coming forward:

> [Defense Counsel] Although you didn't have an agreement with the District Attorney's office you hoped that this would help you in terms of your predicament, that you were in prison; is that correct?
>
> [Anderson-El] Well —
>
> [Defense Counsel] Yes or no, sir.
>
> [Anderson-El] No, sir.
>
> [Defense Counsel] That motivation didn't come across you at all?
>
> [Anderson-El] As I stated earlier, I wasn't concerned by the cases.
>
> [Defense Counsel] So you were purely motivated by good intentions. Is that what you're saying, Mr. Anderson-El?
>
> [Anderson-El] Yes.
>
> [Defense Counsel] You expected no deal, you expected nothing in return for this information?
>
> [Anderson-El] Well it was already established that we had no deal. So, you know, I mean —
>
> [Defense Counsel] And nothing in the future?
>
> [Anderson-El] No.

¶ 18. The trial court did not erroneously exercise its discretion or deprive Hoover of his constitutional right of confrontation. In *State v. McCall*, 202 Wis. 2d 29, 34–35, 44–45, 549 N.W.2d 418 (1996), the supreme

court held that the circuit court did not misuse its discretion or deny the defendant his right of confrontation by prohibiting the defense from cross-examining a key State witness about the dismissal of three criminal charges that had been pending prior to the beginning of McCall's trial. The defense in *McCall* presented no evidence that there was any agreement between the witness and the State in regard to the witness's testimony or that the witness believed such an agreement existed. *Id.* at 40.

¶ 19. Accordingly, the supreme court held that the mere fact that the witness's pending criminal charges had been dismissed prior to the defendant's trial would not support a reasonable inference that the witness was testifying in accord with an agreement with the prosecution or even that he believed he may have been doing so. *Id.* at 38–40. The circuit court properly exercised its discretion by excluding speculative and irrelevant evidence that could confuse the issues and unfairly prejudice the jury. *Id.* at 44. The supreme court held that the evidence of the dismissal of pending charges against the witness was irrelevant, and therefore, its exclusion did not constitute a misuse of discretion; the exclusion of irrelevant evidence does not violate the constitutional right to confrontation. *Id.* at 42.

¶ 20. The rationale of *McCall* is controlling here. In the absence of any sentencing-for-testimony agreement, it would be irrelevant to question Anderson-El about his sentence. Defense counsel was able to and, in fact, did question Anderson-El about his charges and whether he expected to get a benefit from testifying. However, eliciting information about the actual sentence imposed was not relevant to any incentives the

prosecution may have given Anderson-El for testifying on behalf of the State. Moreover, testimony concerning the actual sentence imposed might confuse the jury into believing the court was a party to some unproven sentencing-for-testimony agreement. As in *McCall*, the record does not support such a speculative theory.

¶ 21. Again, the fundamental inquiry in deciding whether the right of confrontation was violated is whether the defendant had the *opportunity* for effective cross-examination. *See Fensterer*, 474 U.S. at 19–20; *Pulizzano*, 155 Wis. 2d at 645. Our examination of the record convinces this court that Hoover had the opportunity for effective cross-examination. The trial court aptly communicated its willingness to accommodate Hoover's right of confrontation. *See George*, 252 Wis. 2d 499, ¶ 16 n.17. We highlight examples of three such communications:

1. "What [Anderson-El's] expectations from the State recommendations are I think you can go into. If he was expecting because of his cooperation to get a break from the State, that's fine."

2. "And if he thinks that because of the State's position he receives a benefit, that's fine. That I think you can go into. The State promised to make a recommendation of x number of years in part due to my cooperation, is fair game."

3. "[I]f you want to ask him . . . do you think that if you testified today you may, although you're not—the State hasn't agreed to give you anything, you may get some benefit, you can ask him that."

Having made known its intention to accomodate Hoover's right of confrontation, the court did not err in

exercising its discretion to prohibit questions concerning the sentence imposed to avoid confusing the jury into believing that the court had participated in plea negotiations or somehow gave Anderson-El a "break" in his sentence in exchange for his testimony. *See Williams*, 253 Wis. 2d 99, ¶ 7 ("[A] circuit court's decision to admit evidence is ordinarily a matter for the court's discretion, whether the admission of evidence violates a defendant's right to confrontation is a question of law subject to independent appellate review."). This limitation on cross-examination did not violate Hoover's right of confrontation. *See id.*

¶ 22. Moreover, during Anderson-El's cross-examination testimony, the only question to which the State objected was whether Anderson-El thought the charges were "very serious." And while the court sustained the objection without explanation, defense counsel was otherwise unhampered in his opportunity to delve into questions regarding Anderson-El's potential bias.

¶ 23. Thus, since we hold that the opportunity existed to confront Anderson-El, we move to whether Hoover has shown that his counsel was ineffective. He has not. Hoover has not established that his counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Swinson*, 261 Wis. 2d 633, ¶ 58; *Strickland*, 466 U.S. at 687. He has not overcome the strong presumption that his counsel acted reasonably within professional norms. *Id.* The transcript establishes that defense counsel questioned Anderson-El about his personal motivation for coming forward:

> [Defense Counsel] Although you didn't have an agreement with the District Attorney's office you hoped that

this would help you in terms of your predicament, that you were in prison; is that correct?

[Anderson-El] Well —

[Defense Counsel] Yes or no, sir.

[Anderson-El] No, sir.

[Defense Counsel] That motivation didn't come across you at all?

[Anderson-El] As I stated earlier, I wasn't concerned by the cases.

[Defense Counsel] So you were purely motivated by good intentions. Is that what you're saying, Mr. Anderson-El?

[Anderson-El] Yes.

[Defense Counsel] You expected no deal, you expected nothing in return for this information?

[Anderson-El] Well it was already established that we had no deal. So, you know, I mean —

[Defense Counsel] And nothing in the future?

[Anderson-El] No.

We deem defense counsel's performance to be reasonably within professional norms and thus, need not address the prejudice prong of the ineffective assistance of counsel test because Hoover has failed to demonstrate that counsel's performance was deficient. *See Swinson*, 261 Wis. 2d 633, ¶ 58; *Strickland*, 466 U.S. at 687.

¶ 24. Finally, Hoover makes a cursory argument that a new trial is warranted in the interests of justice due to his counsel's confusion over what could or could

not be pursued on cross-examination of Anderson-El. We disagree. Anderson-El's testimony was part of a nine-day jury trial. It was, for the most part, cumulative of other evidence presented, including evidence presented by the State's direct witnesses to the crime.

¶ 25. The final statements of Morris corroborated Anderson-El's testimony. Although Morris gave earlier contradictory statements, his final version and only signed statement agreed with Anderson-El's testimony. Morris gave statements to both the Kenosha police and the Chicago police that placed Hoover at the scene of the crime. Morris indicated that Hoover struck Jones with a golf club, that Hoover helped dispose of Jones's body by placing it in the trunk of a car, and that Hoover drove to Chicago, purchased lighter fluid and burned the body. Morris's trial testimony from his Illinois homicide conviction was read to the jury and it placed Hoover at the scene of the crime and stated that Hoover had hit Jones with a golf club.

¶ 26. Antia's testimony also placed Hoover at the scene of the crime. She stated that Hoover hit Jones with a golf club and that Hoover helped dispose of the body by burning it in Chicago.

¶ 27. The medical examiner testified that the sharp force wounds found on Jones's head were enough to cause death and were consistent with being inflicted by a golf club. Hoover's fingerprints were identified on the lighter fluid cans. Knight's statement, which was read to the jury, indicated that Hoover and Morris approached him on the night of the murder, showed him the body and threatened him in order to get help moving the body.

¶ 28. Thus, we are not moved to differ with the trial court's assessment that "the evidence that is on the record here is so overwhelming absent Anderson-El that the interest of justice does not require a new trial on this matter."

¶ 29. *Due Process Right to a Fair Trial.* Hoover's second claim is that the trial court unconstitutionally relieved the State of its burden of proof by substantially modifying the pattern jury instruction on party to a crime liability and thereby deprived him of his due process right to a fair trial. Whether a jury instruction violated a defendant's right to due process is a question of law subject to our de novo review. *State v. Pettit*, 171 Wis. 2d 627, 639, 492 N.W.2d 633 (Ct. App. 1992). In reviewing a claimed jury instruction error, we do not view the challenged words or phrases in isolation. *Id.* at 637. Rather, "in determining whether the instructions to the jury appropriately advised the jury of the applicable law, or whether any error in the instructions constitutes reversible error, [the supreme court] has recognized that the instructions must not be judged in isolation, but must be considered as a whole." *State v. Ivy*, 119 Wis. 2d 591, 603, 350 N.W.2d 622 (1984). Relief is not warranted, however, unless the court is "persuaded that the instructions, when viewed as a whole, misstated the law or misdirected the jury" in the manner asserted by the challenger to the instruction. *Pettit*, 171 Wis. 2d at 638; *State v. Paulson*, 106 Wis. 2d 96, 108, 315 N.W.2d 350 (1982). In evaluating instructions given to a jury, an error may be rendered harmless if other correct statements of law are contained in the instructions; however, "even if the error is not rendered harmless by other portions of the instructions, there is no reversible error unless it may reasonably be said

627

that, had the error not been made, the verdict might probably have been different." *Paulson*, 106 Wis. 2d at 108 (citation omitted).

¶ 30. A trial court has broad discretion in instructing a jury but must exercise that discretion in order to fully and fairly inform the jury of the applicable rules of law. *State v. Coleman*, 206 Wis. 2d 199, 212, 556 N.W.2d 701 (1996). Whether a crime charged was a natural and probable consequence of the crime with which a defendant allegedly assisted is a factual issue for the jury. *Ivy*, 119 Wis. 2d at 601. Whether a jury instruction is appropriate, under the given facts of a case, is a legal issue subject to independent review. *See Pettit*, 171 Wis. 2d at 639.

¶ 31. The specific section of the jury instruction that Hoover takes issue with states:

> A person who intentionally aids and abets the commission of a crime is also guilty of any other crime which is the natural and probable consequence of the intended crime. A crime is the natural and probable consequence of another crime if in the light of ordinary experience it was the result to be expected, not an extraordinary or surprising result. The probability that one crime would result from another should be judged by the facts and circumstances known to the defendant at the time the events occurred.

¶ 32. Hoover argues that the trial court's use of this modified version of Wis JI—Criminal 406 "violated [his] constitutional right to due process of law by failing to require a jury finding on essential elements of the theory of guilt embodied in Wis. Stat. § 939.05(2)(c), and by improperly relieving the state of [its] burden of proof as to those elements." Specifically Hoover asserts:

> The instruction did not even identify what the intended crime or crimes were and relieved [the] state of its burden to prove beyond a reasonable doubt that Hoover aided and abetted the *intended* crime and that the *charged* crime was a natural and probable consequence of the *intended* crime.

He claims that the jury could not determine if the homicide was a natural and probable consequence of some other crime if the jury did not know what that other crime was.

¶ 33. First, we agree with the trial court that in the future it would be advisable to "elect to give a brief summary of [the intended crimes] rather than completely excis[ing] them from 406." However, we also agree with the trial court that even if any error occurred, under all the circumstances of this case, there is no prejudice to Hoover for the manner in which the jury was instructed. The instruction for the charged crime was given properly as to the elements and the intended crime instruction was adequate to inform the jury.

¶ 34. Finally, we are persuaded by the rationale in *United States v. Elizondo*, 920 F.2d 1308, 1317 (7th Cir. 1990), where the Seventh Circuit held that any error in a conspiracy jury instruction is harmless if the government does not rely solely on that theory of criminal liability. The *Elizondo* court affirmed the conviction because alternative theories of direct and vicarious liability existed for affirming the substantive convictions despite the defective instruction. *Id.* Given this rationale, we consider it significant that like the prosecution in *Elizondo*, the prosecution here did not rely solely on the natural and probable consequence theory of liability—it also relied on a first-degree intentional homicide theory and an aiding and abetting theory.

¶ 35. As a final point, Hoover does not succeed on his claim that his counsel was ineffective for failing to object to the proposed instruction. We note that the trial court found that defense counsel did properly raise and preserve any objection to Wis JI—Criminal 406 and how it should be implemented. However, regardless of whether counsel properly objected or not, we hold that given our harmless error analysis, there is no reasonable probability that counsel's failure to object to the natural and probable consequences jury instruction affected the verdict.

¶ 36. Having thoroughly reviewed the extensive record before us and the relevant law, we hold that Hoover's constitutional right to confront and cross-examine Anderson-El was not violated by the trial court's rulings, nor was it violated by his defense counsel's deficient performance or confusion over what questioning was permissible. In addition, we hold that Hoover's due process right to a fair trial was not violated by the trial court's modification of the pattern jury instruction on party to a crime liability.

*By the Court.*—Judgment and order affirmed.