COURT OF APPEALS
DECISION
DATED AND FILED

May 11, 2021

Sheila T. Reiff
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

Appeal No. **2019AP2059-CR**

STATE OF WISCONSIN

Cir. Ct. No. **2016CF3715**

IN COURT OF APPEALS
DISTRICT I

STATE OF WISCONSIN,

PLAINTIFF-RESPONDENT,

V.

CELSO M. DELEON-YUJA,

DEFENDANT-APPELLANT.

APPEAL from a judgment and an order of the circuit court for Milwaukee County: JEFFREY A. WAGNER, Judge. *Affirmed*.

Before Brash, P.J., Donald and White, JJ.

**Per curiam opinions may not be cited in any court of this state as precedent or authority, except for the limited purposes specified in WIS. STAT. RULE 809.23(3).**

¶1 PER CURIAM. Celso M. Deleon-Yuja appeals the circuit court order denying postconviction relief as well as the underlying judgment of

conviction for two counts of first-degree child sexual assault—sexual contact with a child under age thirteen. Deleon-Yuja argues that his Sixth Amendment Confrontation Clause rights were violated when the circuit court did not permit him to cross-examine the victims or their parents about the U-Visa immigration program. We conclude that the circuit court did not improperly limit cross-examination such that Deleon-Yuja's confrontation rights were violated, and thus did not erroneously deny his motion for postconviction relief. Accordingly, we affirm.

## BACKGROUND

¶2 The following facts are taken from testimony at pretrial hearings and the trial and from other documents in the record. After Deleon-Yuja came home from work on August 17, 2016, a family he and his wife knew through church brought over their two daughters for his wife to babysit. Deleon-Yuja's wife had watched the girls, K.A.I., age seven, and F.A.I., age nine, several times that summer, although typically while Deleon-Yuja was at work. The Deleon-Yuja's had an infant daughter who was approximately two-and-a-half months old. Deleon-Yuja took the baby into the bedroom. Deleon-Yuja's wife, in her trial testimony, explained that

> I left the girls in the living room watching TV, and [Deleon-Yuja] was in the room, and I went to the kitchen to make food. I get out of the kitchen because the food was ready, and I see that [K.A.I.] wasn't in the living room anymore, and when I go into the [bed]room, I see both of them on the bed, and I just see his hand on her waist.

She "couldn't believe" what she was seeing and she was "really mad" when she saw Deleon-Yuja touching K.A.I. She asked him to go to the kitchen with her because she "didn't want to be fighting in front of the girl." She was so upset she

2

threw away the food she had just made in the garbage, and then Deleon-Yuja left the house.

¶3 Deleon-Yuja's wife took the girls to her upstairs neighbor, whom she knew through church and whom she trusted. She explained what happened to the neighbor, who then did not feel comfortable with Deleon-Yuja's wife continuing to watch the girls, so the neighbor took the girls to church with her. The neighbor then returned from church with the girls and took them back to her house; the girls' parents arrived at the neighbor's house around 9:00 p.m. When the parents picked up the girls, Deleon-Yuja's wife went outside to explain to them what happened and said she was embarrassed by her husband.

¶4 The girls' father, in his trial testimony, stated that he and his wife received a call from the Deleon-Yuja's upstairs neighbor saying that they had to come and pick up his daughters because "[s]omething's happened to the girls." When they arrived at the house, the neighbor came out and brought the girls to their parents. Then Deleon-Yuja's wife came out, crying and asking for forgiveness. She explained to the parents that she saw Deleon-Yuja's hand on K.A.I. and demonstrated using her hand moving on her body. The girls' father talked to K.A.I. on the night of August 17, 2016, and asked her where Deleon-Yuja had touched her. K.A.I. told him Deleon-Yuja touched her genitals, both vaginal and anal areas, and that he put his hands under her clothes.

¶5 The girls' mother spoke to the girls as well on August 17, 2016, according to her trial testimony. She described taking a crying K.A.I. into her arms and asking where Deleon-Yuja had touched her. K.A.I. told her that he touched her breast area and in the vaginal and anal areas.

¶6     After the parents spoke to K.A.I., the Milwaukee Police Department was contacted and an investigation began the next day.  A detective in the Sensitive Crimes Division interviewed the girls and their parents about the allegations against Deleon-Yuja.  The detective arranged for forensic interviews of K.A.I. on August 18, 2016, and F.A.I. on August 19, 2016.  As a result of those interviews, allegations that Deleon-Yuja also touched F.A.I. arose.  Deleon-Yuja was arrested; the criminal complaint was filed on August 22, 2016, charging Deleon-Yuja with two counts of first-degree sexual assault of K.A.I. and F.A.I.

¶7     On January 11, 2017, trial counsel emailed the prosecutor and requested a copy of the "Victim certification," referring to the U-Visa program procedure, and asked if the State would agree to allow the defense to cross-examine the girls' parents about the U-Visa certification.[1]  At the January 17, 2017 pretrial hearing, the defense informed the circuit court[2] that it would like to ask the girls' father a few questions during cross-examination about applying for a new visa.  That same day, the State emailed a response to trial counsel objecting to questions about the U-Visa because it was not relevant to the proceedings.

¶8     During the pretrial proceedings before Deleon-Yuja's scheduled jury trial in February 2017, the circuit court heard arguments on Deleon-Yuja's request

---

[1]  A U-Visa is "a nonimmigrant visa that allows a victim of a violent crime who provides assistance to law enforcement to remain in the United States for four years." *Guerra Rocha v. Barr*, 951 F.3d 848, 850 (7th Cir. 2020).

[2]  The Honorable David Swanson presided over the initial jury trial proceedings and made the evidentiary ruling at issue.  The Honorable Jeffrey A. Wagner presided over some pretrial proceedings, the completed trial, and Deleon-Yuja's postconviction motion.  Because the case transferred multiple times, we refer to either judge as the circuit court.

to cross-examine the girls' parents about any U-Visa applications and the State's opposition to those questions.

¶9 First, Deleon-Yuja stated his position on the relevance of the U-Visa application to the circuit court, contending that he should be allowed to question the girls' parents on their U-Visa application for impeachment purposes. Trial counsel argued that his client's wife did not report that she saw Deleon-Yuja sexually assault K.A.I., but instead she reported she saw her husband touching K.A.I.'s waist area. He asserted that it was only after the girls' parents spoke to K.A.I. that anyone mentioned vaginal and buttocks touching. Trial counsel stated, "[t]hey are from Mexico. They are illegally here in the United States …. We know that if not [for] this case they probably might be on the way out or they might be even deported by now due to current administration policies." Trial counsel continued, "this is the … only hope for them to stay here in United States. Otherwise they might be deported. They might be separated from their two daughters, two girls who are citizens of [the] United States." Trial counsel argued that the U-Visa program may have given the parents a motive "to falsify these charges[.]" He contended that he and the State could make their arguments and let the jury decide. Trial counsel proposed that during cross-examination, he would ask the girls' father if it was true that he applied for a U-Visa or applied "to be certified as a victim due to this case[.]"

¶10 In response, the State argued that the circuit court should bar trial counsel from questioning any of the family on the U-Visa application, because it was a "slippery slope" toward questions about immigration law. The State asserted:

5

I don't know what a U-Visa is. I don't know what it means. I'm certain that our jurors have even less of an idea than I do.

So the only way that this all becomes relevant to them is if they are given context. Well, a U-Visa means that it's a federal program that basically allows people who are otherwise undocumented or illegal to gain the benefit of, I guess, a Green Card. I'm not even clear.

….

So we are left with really a bare accusation that these people are illegal. That's what he's doing. He's saying the mom, the dad are illegal and their kids illegal and they are not supposed to be here. And the prejudice that's created by that really outweighs any minimal benefit to what that testimony or status could give this case.

¶11    The State continued its argument to the circuit court, asserting that the timeline made it clear that the sexual assaults were brought to the police's attention well before any actions were taken on immigration.

When you talk about how this case came forward, and I made a little effort yesterday, the defendant's wife … was baby sitting the two children.

She walked in on the defendant doing something she thought was inappropriate. How do we know she thought it was inappropriate? Because of her actions. She yelled at the defendant. Screamed at him. Got the kids out of there, sent the kids to the upstairs neighbor ….

So whatever she's going to say today about what she actually saw we know from her actions what she thought about it.

We also know that she told everyone that she asked [K.A.I.] that little girl what was going on before anyone else was involved, and [K.A.I.] told her that the defendant was touching her chest.

The very next night [K.A.I. was] are being interviewed by the police. I think that's, again, clearly before any chance or thought of a U-Visa would have entered into anyone's head.

6

And [K.A.I.] gives a detailed disclosure about the defendant inserting his finger into the various orifices of her.

So the allegation is all out there long before there's any real chance or taint of this idea that the family is doing this to get a U-Visa which means that the relevance of this if there is any relevance is very minimal.

I think that prejudice I talked about really outweighs that. So I'm worried that these questions would distract the jury. I'm worried they'd confuse the jury with questions about people's status.

¶12 After hearing arguments from both parties, the circuit court assessed the situation and concluded:

I agree with the [S]tate here that bringing the family's illegal status before the jury could be highly prejudicial to … how their testimony is viewed by the jury.

And I also agree with the [S]tate that it could be confusing to the jury to lead them to believe that it's somehow relevant. Because the family's status, immigration status, really is not relevant to this case at all.

So I am—I do believe that there just is extremely limited relevance here. It would be very, again, highly prejudicial to how the testimony of the girls and their parents would be viewed by the jury.

However, I do think there is—There's some limited probative value of the general avenue of questioning that [trial counsel] is asking to proceed on.

As I understand what [trial counsel] wants to inquire into is whether the girls were coached or not, and I think that is a relevant avenue of inquiry here.

So, [trial counsel], I am going to bar you from asking specific questions about the family's immigration status or whether they applied for this type of Visa and when they applied for any type of Visa.

However, since both girls I understand will be testifying and the parents as well I believe it … would be fair for the defense to be permitted to ask the girls if they had been coached and also to ask the parents if the parents

7

had engaged in any coaching of the girls to report these crimes, these alleged crimes.

¶13     Deleon-Yuja's trial was adjourned in February 2017 because the State needed time to produce transcripts of the forensic interview videos. Deleon-Yuja's trial resumed in May 2017, with a new jury panel sworn in on May 8, 2017, and an amended information filed May 9, 2017.[3]

¶14     Although some of the trial testimony was recited above; here, we review relevant testimony from the trial not previously stated. The State called the the Milwaukee Police Department detective who investigated the allegations against Deleon-Yuja and who testified about the investigation.

¶15     The State called the officer in the Milwaukee Police Department Sensitive Crimes Division who conducted the forensic interview of K.A.I. The video was played for the jury, and after, the officer testified about the interview. K.A.I. identified Deleon-Yuja in a photo. She stated Deleon-Yuja "took off her pants and grabbed her hands and she said no." K.A.I. demonstrated what she alleged Deleon-Yuja did to her using an anatomically correct female doll: she put her pinkie finger inside the vagina and inside the anus. She stated that she told him to stop and he still did it. She also demonstrated that Deleon-Yuja lifted her shirt and pinched her nipples. She also described having Deleon-Yuja kiss her neck. On cross-examination, the officer confirmed that in the interview, K.A.I. did not accurately state her zip code or the color of the walls in the room when

---

[3] The State tried Deleon-Yuja on an amended information for one count of first-degree child sexual assault—sexual contact with a child under age thirteen based on Deleon-Yuja's alleged contact with K.A.I. on August 17, 2016; and one count of first-degree child sexual assault—sexual contact with a child under age thirteen based on Deleon-Yuja's alleged contact with F.A.I. between approximately March 1, 2015, and August 17, 2016.

asked, and that she said she did not know the difference between the words "truth" and "lie."

¶16     The State called K.A.I.  The prosecutor asked simple questions to demonstrate whether K.A.I. understood the difference between the truth and a lie; she correctly identified her own name as the truth and calling her by her sister's name as a lie.  K.A.I. testified that she used to go to Deleon-Yuja's house, identified Deleon-Yuja's wife and made an in-court identification of Deleon-Yuja. On direct examination, K.A.I. testified that Deleon-Yuja touched her "on the private part" and identified where he touched her using an anatomical diagram that was entered into evidence.  On redirect, K.A.I. was unable to state where on her private parts Deleon-Yuja touched her.  She testified that she was in the bedroom with Deleon-Yuja and Deleon-Yuja's infant daughter while Deleon-Yuja's wife was cooking in the kitchen during the incident.  She testified that it made her feel bad when Deleon-Yuja touched her under her clothes.

¶17     The State then called the detective in the Milwaukee Police Department Sensitive Crimes Division who conducted the forensic interview of F.A.I., which was recorded.  The video was played for the jury.[4]  During the video, F.A.I. told the officer that Deleon-Yuja rubbed her private part over her clothes with his hand.  She told him to stop.  The detective clarified on direct examination that F.A.I. used a body diagram and anatomically correct doll to show that by "private part" she meant her vagina.  On cross-examination, the detective testified

---

[4] In response to the defendant's motion *in limine*, the circuit court ruled that a selection of the video of F.A.I.'s forensic interview was inadmissible.  The parties agreed which selection would be shown to the jury.

that while F.A.I. stated she was eight years old in the interview, she was actually nine years old.

¶18 The State called F.A.I., who testified that she understood the difference between a truth and a lie and promised to tell the truth. F.A.I. testified that Deleon-Yuja's wife watched her and her sister at her apartment. F.A.I. testified that the last day that Deleon-Yuja's wife watched her and her sister, she was watching television, Deleon-Yuja's wife was in the bathroom, and K.A.I. went into the bedroom with Deleon-Yuja and the baby. F.A.I. testified that she told her "sister not to get in the room, but she did." Then, when Deleon-Yuja's wife left the bathroom, she saw what Deleon-Yuja was doing and told the girls they were going to her upstairs neighbor's house. She testified that Deleon-Yuja's wife was crying.

¶19 F.A.I. also testified about her own incidents with Deleon-Yuja that were discussed on the video shown to the jury. During one of the days that Deleon-Yuja's wife watched her and her sister, F.A.I. recalled that K.A.I. and the baby were playing in the kitchen, Deleon-Yuja's wife was in the kitchen or the bathroom, and F.A.I. was watching television in the living room when Deleon-Yuja sat down next to her. She testified that Deleon-Yuja touched her private part over her clothing. She told him to stop and he did, but she was in shock and she did not tell anyone what happened at the time.

¶20 F.A.I. also recalled a time she was at church and she went to look for her older brother, but instead she found Deleon-Yuja and he hugged her "weirdly." She explained that, "[t]hat when you give a normal hug, you just hug and then leave it go, but he still did it. And I was telling him to stop, but he didn't want to stop." She also stated that he was "moving his hands" on her arms and sides.

10

After F.A.I. told Deleon-Yuja to stop a second time he did and she tried to go downstairs as fast as she could, then Deleon-Yuja grabbed her by the foot, she again told him to stop, but "he didn't want to stop." F.A.I. testified that when he let go, she went to her mother and told her.

¶21 The State then called Deleon-Yuja's wife. In her testimony, she confirmed that they moved to the house where the incident with K.A.I. occurred in late March or early April 2016, before her baby was born in May 2016. She never watched the girls at her old residence; all of the babysitting occurred at her current residence. She testified that she started watching the girls in mid July and stopped on August 17, 2016.

¶22 In addition to her testimony about the incident on August 17, 2016, Deleon-Yuja's wife testified that when she started taking care of the girls, she was very clear that it was her job to babysit the girls. In her words:

> I talked with both of them to—I told him to not be around the girls as much or to not even touch them or anything, and I talked to the girls, and I told them to not play around with [Deleon-Yuja] or to be involved with him; if, you know, you see [Deleon-Yuja] in one room, to go to the other one.

¶23 The State called the girls' father, who testified that he and his wife left the girls with Deleon-Yuja's wife and went to work at the church they attended as did Deleon-Yuja's family. He explained that he was studying theology, he participated in music ministry, and he served as an elder in their church. He met Deleon-Yuja four or five years ago through the church they both attended. He stated that he and Deleon-Yuja had "a very nice relationship" and he has "a lot of regard for him and also for [Deleon-Yuja's wife]." He explained they

11

"spent a lot of time together ... have them over for dinner … spend time in our home socially."

¶24 The girls' father testified that when he picked up the girls from the Deleon-Yujas' neighbor on the night of the incident, Deleon-Yuja's wife came out to ask the parents to forgive her because she said she did not take good care of their daughters. The girls' father testified that Deleon-Yuja's wife explained that she saw Deleon-Yuja touching his daughter while he was lying on the bed. She gestured to show him where Deleon-Yuja touched K.A.I., over her side and arms. It was unclear to the girls' father if the touching included the chest. Because Deleon-Yuja's wife was so upset, the girls' father did not want to ask more questions about exactly where K.A.I. was touched, and he testified, "I would be sinning if I told you that I knew for sure what areas." The State asked him whether Deleon-Yuja's wife had told him that she had seen Deleon-Yuja "touching the girls a different time and that [Deleon-Yuja] had told her not to exaggerate and he was just playing with the girls?" The girls' father responded, "She did tell us about another occasion … I don't remember exactly what it was as far as the details, but … she had basically … warned him as far as, like, not touching the girls, make sure you don't touch them, or be careful with them."

¶25 The girls' father testified that he also spoke to, F.A.I.—his older daughter—after the incident with K.A.I. He discussed an incident with F.A.I. that she first reported to her mother. Sometime between March and June of 2016, F.A.I. complained that Deleon-Yuja gave her an unwanted and unusual hug in a stairwell at their church and she was uncomfortable.[5] In hindsight, the father

---

[5] The girls' mother also testified that F.A.I. told her about a hug from Deleon-Yuja in the stairway at church in about March 2016, about five months before the incident with K.A.I.

viewed F.A.I.'s report differently than he received it when he heard about it earlier in the year.

¶26    Deleon-Yuja chose to testify in his own defense. On August 17, 2016, his wife was cooking in the kitchen; the girls were watching a show in the living room, where his wife told them to stay; and Deleon-Yuja took the baby into the bedroom to lie down. Because the baby was fussy, Deleon-Yuja started to change the baby's diaper and K.A.I. opened the door to the bedroom. As Deleon-Yuja cleaned up the baby, K.A.I. asked him why he was touching the baby, and the baby peed all over her clothing, to which K.A.I. said "eew." Deleon-Yuja could hear his wife calling for K.A.I. to return to the living room. Deleon-Yuja told K.A.I. to return to the living room, but K.A.I. said it was okay and stayed in the bedroom and then climbed on the bed. Then K.A.I. started acting up and said she had a stomachache. He rubbed her stomach. His wife came in and asked him what he was doing.[6] He denied touching K.A.I. or F.A.I. inappropriately. He did not remember the incident at the church to which F.A.I. testified.

¶27    The jury returned a verdict of guilty on both counts of first-degree sexual assault of a child under age 13; one count for the assault of K.A.I. on August 17, 2016, and the other for an assault of F.A.I. between March 1, 2015, and August 17, 2016. The circuit court entered judgments of conviction for both charges. The court imposed twelve years on each count, to be served

---

[6] We note that on cross-examination, K.A.I. testified that she did not remember either the diaper change or having a stomachache. Deleon-Yuja's wife testified that she did not remember seeing a used diaper or clothing in the bedroom and that she did not hear the baby crying or fussing. Further, she did not remember K.A.I. complaining of a stomachache.

consecutively, with seven years of initial confinement and five years of extended supervision on each count.

¶28    Deleon-Yuja filed a postconviction motion seeking a new trial arguing that he was denied his right under the Confrontation Clause to conduct a meaningful cross-examination of the state's witnesses on the issue of a U-Visa application or certification. In May 2019, the circuit court denied Deleon-Yuja's motion without a hearing.[7] The circuit court explained:

> There is nothing in the record that the victims or their family knew about a U-[V]isa when the sexual assault disclosures were made. The initial disclosure was made by the defendant's wife to a neighbor, before the parents had any knowledge that something bad had happened. Moreover, there was no evidence that the victims or their parents had an illegal immigration status.

¶29    The circuit court criticized trial counsel for making allegations about the family's immigration status, first stating they were from Guatemala, then Mexico, and later admitting the girls were United States citizens. The circuit court concluded that in this case, "evidence that the parents applied for a U-[V]isa based

---

[7] Deleon-Yuja relied on two out-of-state cases to support the admissibility of testimony about the U-Visa program for impeachment purposes: *State v. Valle*, 298 P.3d 1237 (Or. Ct. App. 2013) and *Romero-Perez v. Commonwealth*, 492 S.W.3d 902 (Ky. Ct. App. 2016). The circuit court distinguished that in these cases, a practical connection existed between the victim's report of criminal activity and the application for a U-Visa. Here, there was no evidence that the girls' parents were aware of the U-Visa program before the sexual assault allegations were first reported. Furthermore, although the State acknowledged that the family had applied for a U-Visa, there was no showing that their success in obtaining a U-Visa was dependent on their status as a victim of alleged sexual assaults. The circuit court concluded this case was more like *State v. Buccheri-Bianca*, 312 P.3d 123 (Ariz. Ct. App. 2013), in which there was nothing in the record that the victims or their family knew about the U-Visa program when the child disclosed abuse and there was no evidence that the victim or any other member of the family had an unauthorized status. Therefore, the *Buccheri-Bianca* court concluded that evidence of the U-Visa program was not relevant and it was within the circuit court's discretion to exclude testimony or evidence about it.

14

upon the sexual assault disclosures made by their children might have been relevant to impeach the parents assuming an illegal status," however, such evidence would not "impeach the child victims' statements" unless there was "a showing that such evidence was relevant to discredit their testimony." The circuit court succinctly addressed the issue with trial counsel's attempt to suggest that parents coached the girls to falsify their statements in order to secure a U-Visa, stating:

> The problem with that strategy is that the initial disclosure that the defendant had done anything wrong came from the defendant's wife who reported it to an upstairs neighbor and then to the victims' parents. The parents went to their pastor who told them to contact law enforcement. Evidence that sexual assault allegations were being reported before the victims' parents knew anything about them belies a "practical connection between the evidence sought to be introduced and the alleged implication of bias."[8]

¶30    The circuit court found that it had ruled correctly before the trial that the U-Visa program evidence was of "extremely limited relevance" to this case. Even if it had ruled erroneously, the circuit court concluded it was clearly harmless error, stating:

> Given the prompt reporting by the young victims, the consistencies in their statements, the corroborating physical and non-physical evidence, the defendant's awkward and self-serving testimony, and a chain of disclosure that belied a motivation to falsify the allegations of abuse or to coach the victims, the court finds that there is no reasonable probability that questioning the victims' parents about a U-[V]isa or their immigration status would have altered the outcome of the trial.

---

[8] We note that the circuit court decision appears to quote ***Romero-Perez v. Commonwealth***, 492 S.W.3d 902, 907 (Ky. Ct. App. 2016) (quoting ***Holt v. Commonwealth***, 250 S.W.3d 647, 653 (Ky. 2008)).

15

¶31    This appeal follows.

## DISCUSSION

¶32    Deleon-Yuja argues that the circuit court violated his Sixth Amendment Confrontation Clause rights by prohibiting him from questioning the girls or their parents about their U-Visa application or certification. He argues this evidence is relevant. He asserts that the existence of the U-Visa application establishes a relationship between the State and the victims and witnesses and that is evidence of bias; therefore the court employed an incorrect legal standard when it required him to show evidence of favorable treatment to establish bias. He argues that the court erred when it concluded that mentioning the victims' family's immigration status would be highly prejudicial. Each of Deleon-Yuja's arguments fail.

¶33    "The Confrontation Clause of the Sixth Amendment guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'" *Delaware v. Van Arsdall*, 475 U.S. 673, 678 (1986). "Confrontation means more than being allowed to confront the witness physically"; the "primary interest" the confrontation clause secures "'is the right of cross-examination.'" *Davis v. Alaska*, 415 U.S. 308, 315 (1974) (citation omitted). The Confrontation Clause does not bar a circuit court from imposing "reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Van Arsdall*, 475 U.S. at 679.

¶34    "The extent and scope of cross-examination allowed for impeachment purposes is a matter within the sound discretion of the circuit court."

16

*State v. McCall*, 202 Wis. 2d 29, 35, 549 N.W.2d 418 (1996).[9]  "The circuit court has broad discretion in determining the relevance and admissibility of evidence and its decision will not be reversed absent an erroneous exercise of discretion." *State v. Weed*, 2003 WI 85, ¶9, 263 Wis. 2d 434, 666 N.W.2d 485.  In reviewing a discretionary determination, we consider "whether the circuit court 'reviewed the relevant facts; applied a proper standard of law; and using a rational process, reached a reasonable conclusion.'"  *State v. Rhodes*, 2011 WI 73, ¶22, 336 Wis. 2d 64, 799 N.W.2d 850 (citations omitted).

¶35    Deleon-Yuja argued that the circuit court erred by refusing to admit relevant evidence when it prohibited him from cross-examining the victims or their family about U-Visa immigration.  The record reflects that the circuit court reviewed the timeline from when Deleon-Yuja's wife saw Deleon-Yuja touching K.A.I., then she took the girls out of the apartment, she told the girls' parents what happened, and then the police were called to investigate within a day.  Our examination of the record shows that Deleon-Yuja was arrested the next day and the criminal complaint was filed within days.  When the circuit court considered whether the parents were motivated to falsify the abuse in an effort to secure immigration status, it concluded that the U-Visa application was of "very limited relevance."  It also concluded that questions about immigration would be "highly prejudicial to how the testimony of the girls and their parents would be viewed by

---

[9] We note there is no Wisconsin law specifically addressing a separate standard of review for the admission of impeachment evidence based on the U-Visa program.  We review it as any other question of cross-examination evidence for impeachment purposes, which is admitted at the circuit court's discretion.  The only Wisconsin decision addressing the U-Visa program is a *State v. Viveros*, No. 2016AP1043-CR, unpublished slip op. (WI App Dec. 12, 2017), which is per curiam.  Under WIS. STAT. § 809.23(3)(b) (2019-20), per curiam opinions may not be cited for persuasive value.  All references to the Wisconsin Statutes are to the 2019-20 version unless otherwise noted.

the jury." The circuit court then weighed the relevance and risk of prejudice and concluded there was "some limited probative value[.]" The circuit court decided to allow Deleon-Yuja to question the girls' father about any coaching of the girls' testimony, but barred trial counsel from asking about the family's immigration status. In other words, the circuit court considered the relevant facts, applied the proper legal standard, and employed rational decision-making to reach a reasonable conclusion. *See id.* We conclude that the circuit court appropriately exercised its discretion when it limited cross-examination on immigration.

¶36 Deleon-Yuja argues that we must consider the circuit court's ruling to improperly limited cross-examination in violation of his Sixth Amendment rights to confrontation. We again conclude that even viewed as a constitutional question, the circuit court appropriately exercised its discretion. "[T]he fundamental inquiry in deciding whether the right of confrontation was violated is whether the defendant had the *opportunity* for effective cross-examination." **State v. Hoover**, 2003 WI App 117, ¶21, 265 Wis. 2d 607, 666 N.W.2d 74. Here, the circuit court balanced the relevancy of the issue and allowed Deleon-Yuja to question the girls' parents on whether they coached the girls. This effectively reached the relevant question of whether the girls or their parents' testimony was falsified in any way,[10] while avoiding any potential distraction of the jury relating to immigration law and policy. The circuit court imposed a reasonable limit and allowed Deleon-Yuja to exercise his rights of confrontation. We conclude there was no constitutional violation.

---

[10] We note that trial counsel did not cross-examine the girls' father about false testimony or any coaching of the girls.

¶37    Deleon-Yuja further argues that the circuit court applied the wrong standard to the admissibility determination because the court did not state that the prejudice of the U-Visa "substantially outweighed" the relevance.  By the rules of evidence, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  WIS. STAT. § 904.03.  The circuit court stated the U-Visa program evidence was of "extremely limited relevance" and that it would be "highly prejudicial to how the testimony of the girls and their parents would be viewed by the jury."  It acknowledged that there is "some limited probative value of the general avenue of questioning that [trial counsel] is asking to proceed on."  Although it is clear that the circuit court performed the required weighing to determine admissibility, it did not use the exact statutory terms. However, as the State points out, there are no "magic words" required for the circuit court to make this determination.  *See State v. Gary M.B.*, 2004 WI 33, ¶26, 270 Wis. 2d 62, 676 N.W.2d 475.[11]  We conclude that this argument lack merits because the circuit court's reasoning and its conclusions on the prejudicial effect of questions on immigration were clear in the record.

¶38    Deleon-Yuja argues that the circuit court erred when it required him to present specific instances of bias in order to question the family on immigration. He argues that bias is established by the relationship between the State and the

---

[11] Even when a circuit court "did not expressly state the name of [WIS. STAT. § ]904.03 … or use the words 'weighing' or 'balancing' or some similar word or words to describe its analysis, [that] does not mean that the court failed to exercise its discretion.  We do not recognize such a 'magic words' argument." *State v. Gary M.B.*, 2004 WI 33, ¶26, 270 Wis. 2d 62, 676 N.W.2d 475 (citation omitted).

victim through the U-Visa certification process. Deleon-Yuja relies on Wisconsin law that allows a defendant to cross-examine a witness regarding motivation to testify for the state. *See State v. Barreau*, 2002 WI App 198, ¶55, 257 Wis. 2d 203, 651 N.W.2d 12. "It is generally recognized that evidence of pending charges against a witness, even absent promises of leniency, may reveal 'a prototypical form of bias.'" *Id.* (citation omitted). First, we distinguish *Barreau* because there were no pending charges against the girls or any family members and the State's position in certifying a federal U-Visa application has far less control over the outcome than when the prosecutor determines what plea offer would be made in exchange for testimony. Second, as the circuit court concluded, the record reflects no favorable treatment of the victims or their family in relation to the U-Visa program or any favorable treatment in exchange for their testimony. Third, the sexual assaults were reported by Deleon-Yuja's wife to her neighbor before the girls' parents knew about it. The timeline of disclosures make it highly speculative that the girls' parents were motivated to falsify these allegations or to coach the girls to further an immigration process. *See McCall*, 202 Wis. 2d at 42. Ultimately, Deleon-Yuja's speculation does not establish bias on the part of the girls' parents, bias from a U-Visa certification, or any error in the circuit court ruling.

¶39     Deleon-Yuja argues that the risk of unfair prejudice was low if the girls or their parents were questioned about possible bias in their testimony due to the U-Visa program. "Although a defendant is entitled to significant latitude" to examine witness bias, the circuit court has the duty to limit cross-examination when it would "divert the trial to extraneous matters or confuse the jury by placing undue emphasis on collateral issues" or inquire into issues distracting or speculative. *Id.* at 41-42. He argues there is nothing unfairly prejudicial about the

jury finding out that the family is undocumented immigrants. We note that Deleon-Yuja takes contrary positions on the importance of the family's immigration status. In pretrial, trial counsel argued the U-Visa program was "the only hope, the only hope for them to stay here in United States. Otherwise they might be deported. They might be separated from their two daughters, two girls who are citizens of [the] United States." In this appeal, Deleon-Yuja argues that the risk of unfair prejudice is low and that "the jury may see their willingness to testify in spite of their undocumented status as proof of their truthfulness." Deleon-Yuja's arguments are highly speculative in multiple ways. Furthermore, we agree with the circuit court's assessment that evidence about the parents' U-Visa application would not impeach the girls' testimony. We conclude the court appropriately exercised its discretion when it prohibited questions that divert the trial into collateral or speculative concerns about immigration.[12]

## CONCLUSION

¶40 We conclude that Deleon-Yuja's Sixth Amendment Confrontation Clause rights were not violated when the circuit court limited cross-examination about the U-Visa program. The circuit court weighed the potential relevance of questions about immigration with the probative value of that evidence and

---

[12] Further, Deleon-Yuja argues that if the court was concerned that questions about the U-Visa program would be confusing and could lead the jury to believe the U-Visa application or immigration status was relevant, the court could have imposed a curative jury instruction. Curative instructions are considered for admitted evidence. If the court had admitted this line of cross-examination, the burden would be on Deleon-Yuja to request a curative instruction. *See State v. Payano*, 2009 WI 86, ¶100, 320 Wis. 2d 348, 768 N.W.2d 832 (explaining that cautionary or curative jury instructions are "not required unless requested."). We note that trial counsel did not propose such an instruction when it argued for cross-examination on the U-Visa program. Moreover, Deleon-Yuja's argument does not undermine our conclusion that there was no error in the circuit court's exercise of discretion to exclude this line of questioning.

concluded that the potential unfair prejudice to the victims outweighed the value of this argument in Deleon-Yuja's defense strategy. Accordingly, the circuit court's decision to limit cross-examination was an appropriate exercise of discretion. Therefore, we affirm the circuit court's denial of Deleon-Yuja's motion for postconviction relief and his judgment of conviction.

*By the Court.*—Judgment and order affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)5.